**EXXON CORPORATION, Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS and Oryx Energy Company, Appellees.**

No. 03–98–00329–CV.

Court of Appeals of Texas, Austin.

March 18, 1999.

Rehearing Overruled July 15, 1999.

David E.Jackson, Austin, for appellant.

Philip F. Patman, Patman & Osborn, Austin, for Oryx Energy Co.

John Cornyn, Atty Gen., Priscilla Hubenak, Asst. Atty. Gen., Natural Resources Division, Austin, for Railroad Com'n of Texas.

Before Justices KIDD, PATTERSON and POWERS. *

JOHN E. POWERS, Senior Justice (Retired).

Exxon Corporation sued the Railroad Commission of Texas for judicial review of a final order issued by the agency in a contested case. Oryx Energy Company intervened in the cause. Exxon appeals from a trial-court judgment affirming the Commission order. We will affirm the judgment.

---

\* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. For the reader's convenience in understanding our opinion, we set out below the provisions of Rule 38 invoked by the parties.

## THE CONTROVERSY

Oryx's Brown Altman Acct 4 Unit ("the Oryx Unit") is a 160–acre unit, in Winkler County, that produces natural-gas from the Emperor (Devonian) Field. The Oryx Unit is composed of two tracts. The first is a forty-acre tract that was subdivided from a larger tract in 1947; the second is a 120–acre tract that was created and pooled with the forty-acre tract in 1958. Before such pooling, the Commission adopted in 1956 the Emperor (Devonian) Field Rules. The field rules fixed a well-density ratio of one well per 320 acres. The two tracts, individually and collectively, contain only half of the 320 acres required for well-density purposes. The unit has had only one well, "Well No. 5," since its creation.

The forty-acre tract is a "legal subdivision," in Commission parlance, because it resulted from the subdivision of a larger tract in 1947 before discovery of oil and gas in the area—it could not have been created, therefore, to circumvent Commission density and spacing rules. And because the tract is a legal subdivision, there attaches to the mineral owner a right to a reasonable opportunity to recover a fair share of the underlying minerals, as discussed hereafter. The 120–acre tract, on the other hand, is known as a "voluntary subdivision" because it was created and pooled with the forty-acre tract after the Commission adopted the Emperor (Devonian) Field Rules.

The foregoing classifications have important consequences under the Commission's statewide density rule—Rule 38. *See* 16 Tex. Admin. Code § 3.38 (1998) ("Rule 38").[1] The most important are these: For a legal subdivision having substandard acreage (less than 320 acres in this instance), no exception to density require-

---

(a) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise.
* * *

(4). Substandard acreage—Less acreage than the smallest amount established for standard or optional drilling units.

ments is necessary "for the first well on the . . . drillsite tract of a pooled unit." Rule 38(d)(1). In the case of a voluntary subdivision having substandard acreage, on the other hand, an exception to the density requirements must be obtained and it may be granted only to prevent waste. Rule 38(d)(2).

After adopting the Emperor (Devonian) Field Rules in 1956, the Commission issued in the following year a permit to drill Well No. 5, the first well on the forty-acre tract and the first on the unit. Well No. 5 was completed in the Emperor (Devonian) Field and produced for a number of years before it began to deteriorate with an attendant decline in production. Workovers in 1972 restored production until 1995 when production began to decline rapidly. Oryx applied for a Commission permit to drill a new well, "Well No. 6," *off* the forty-acre tract and 1,267 feet from Well No. 5. Oryx contended this location and distance were necessary to avoid the water en-

croachment that had caused the deterioration in Well No. 5. Exxon appeared in the Commission proceeding that followed the application and opposed issuance of the permit. While the application was pending, Oryx attempted unsuccessfully to rehabilitate Well No. 5; and in the course of the agency proceeding, Oryx amended its application to request a permit to drill Well No. 6, *on* the forty-acre tract, as a replacement for Well No. 5.

After a contested-case hearing, the Commission denied Oryx's application to drill a new well off the forty-acre tract but granted the application to drill Well No. 6, as a replacement well, on the forty-acre tract. The Commission based its decision on the following findings of fact and conclusions of law:

### Findings of Fact
\* \* \*

7. There are no unusual geological conditions or structures under the Oryx

\* \* \*

(b) Density requirements.
(1) General prohibition. No well shall be drilled on substandard acreage except as hereinafter provided.

\* \* \*

(d) Applications involving the voluntary subdivision rule.
(1) Density exception not required. An exception to the minimum density provision is not required for the first well on a lease, pooled unit, or unitized tract composed of substandard acreage, when the lease, or the drillsite tract of a pooled unit or unitized tract:
(A) took its present size and shape prior to the date of attachment of the voluntary subdivision rule (§ 3.37(g) of this title (relating to Statewide Spacing Rule));
(B) took its present size and shape after the date of attachment of the voluntary subdivision rule (§3.37(g) of this title (relating to Statewide Spacing Rule)) and was not composed of substandard acreage in the field according to the density rules in effect at the time it took its present size and shape.
(2) Density exception required. An exception to the density provision is required, and may be granted only to prevent waste, for a well on a lease, pooled unit, or unitized tract that is composed of substandard acreage and that:

(A) took its present size and shape after the date of attachment of the voluntary subdivision rule (§ 3.37 of this title (relating to the Statewide Spacing Rule)); and
(B) was composed of substandard acreage in the field according to the density rules in effect at the time it took its present size and shape.
(3) Division after joinder or unitization. If two or more separate tracts are joined or unitized for oil, gas, or geothermal development and accepted by the commission, the joined or unitized tracts may not thereafter be divided into the separate tracts with the rules of the commission applicable to each separate tract, if the division results in any tract composed of substandard acreage at the time of division [except after notice, an opportunity for hearing or waiver, and commission approval].

\* \* \*

(f) Exceptions to density provisions authorized. The Commission, or Commission designee, in order to prevent waste or, except as provided in subsection (d)(2) of this section, to prevent the confiscation of property, may grant exceptions to the density provisions set forth in this section. Such an exception may be granted only after notice and an opportunity for hearing.

Unit that are different from adjacent parts of the Emperor (Devonian) Field.

8. Substantially all of the recoverable ... gas under the Oryx Unit can be recovered by wells at regular locations under applicable field rules.

9. Existing Well No. 5 has suffered mechanical difficulties which [Oryx] has made reasonably diligent efforts to rectify.

[The efforts are here specified].

10. As a result of its current mechanical problems and the depleted state of the Emperor (Devonian) Field, existing Well No. 5 will not give the mineral interest owners a reasonable opportunity to recover their fair share of hydrocarbons from the Emperor (Devonian) Field.

[Subsidiary findings are here set forth].

11. Because of the likelihood of water encroachment problems in the immediate vicinity of Well No. 5 on the Oryx Unit as a result of water communication from higher horizons, potential well locations less than 100 feet from existing Well No. 5 are unlikely to allow applicant to recover its fair share of reserves from the Oryx Unit.

Conclusions of Law

* * *

3. The substandard Oryx Unit is a voluntary subdivision which may not be granted a permit for a well except as an exception to Statewide Rule 38 to prevent waste.

4. The 40-acre tract on which existing Well No. 5 ... is located is a legal subdivision.

5. Approval of the requested permit to drill a well at the proposed location [off the forty-acre tract] is not necessary to give the owners of the Oryx Unit a reasonable opportunity to recover their fair share of hydrocarbons

in the applied-for fields underlying the unit, or the equivalent in kind.

6. Approval of the requested permit to drill a well at the proposed location [off the forty-acre tract] is not necessary to prevent the loss of a substantial volume of hydrocarbons in the applied-for fields.

7. An exception to Statewide Rule 38 for a well at the applied-for location [off the forty-acre tract] is not necessary to prevent confiscation or to prevent waste.

8. Applicant is entitled to replace existing Well No. 5 on the Oryx Unit with a new well drilled at a location as close as reasonably practical to Well No. 5, but in no event more than 200 feet from the permitted location of Well No. 5.

Exxon raises four issues on appeal, as follows: (1) Whether the Rule 38 exception granted by the final order violates both Commission rules and statutory authority; (2) Whether the Commission's decision to grant a Rule 38 exception is arbitrary or capricious; (3) Whether the Commission's order granting a Rule 38 exception is not supported by substantial evidence; and (4) Whether the trial court erroneously excluded a portion of the agency record from the evidence, which exclusion resulted in harm.

The foregoing issues are somewhat intermingled in Exxon's argument and we will therefore discuss Exxon's several contentions under the headings indicated below.

## ACTS OUTSIDE THE SCOPE OF AGENCY AUTHORITY

■ Exxon contends the Commission, in issuing the permit for Well No. 6, acted without authority because: the 160-acre Oryx Unit encompasses substandard acreage (Rule 38(a)(4)); the Unit is a voluntary subdivision (conclusion of law 1); an exception for voluntary subdivisions having substandard acreage is authorized only to pre-

vent waste (Rule 38(d)(2), (f)); and Oryx failed to prove the ultimate fact of waste (findings of fact 7 and 8; conclusions of law 6 and 7).

The foregoing rationale fails to account for the dual aspect of the Commission's final order. The order expressly *denies* Oryx's application to drill Well No. 6 off the forty-acre tract, *as an exception* under Rule 38, and expressly *grants* the application to drill Well No. 6 on the forty-acre tract *as a replacement* well for Well No. 5, requiring in the permit that Well No. 6 be located as close as practical to Well No. 5 and not more than 200 feet from it. Oryx replies that nothing in Rule 38 purports to create an exception for replacement wells; and, the omission thus implies that such wells are subject to the same Rule 38 criteria applicable to all wells having substandard acreage resulting from a voluntary subdivision. We disagree.

Rule 38(d)(1) states expressly that "[a]n exception to the minimum density provision *is not required* for the *first well* in a field … on … the drillsite of a pooled unit." Rule 38(d)(1) (emphasis added). The proposed Well No. 6 satisfies Rule 38(d)(1), however, only if one accepts that the term "first well" is sufficiently flexible in context to allow for a constructive as well as a literal meaning. Well No. 5 was, of course, the literal "first well" on the forty-acre tract, and Well No. 6 comes within the term only in the constructive sense applied by the Commission: Well No. 6 would be the functional equivalent of Well No. 5 because the latter would cease production; and Well No. 6 would be the legal equivalent of Well No. 5 because, like its predecessor, it was necessary to secure the mineral owner's reasonable opportunity to recover a fair share of the minerals. *See Railroad Comm'n v. Williams,* 163 Tex. 370, 356 S.W.2d 131, 135–36 (1961); *Gulf Land Co. v. Atlantic Ref. Co.,* 134 Tex. 59, 131 S.W.2d 73, 80 (1939). Did the Commission exceed its authority in applying a constructive meaning to the term "first well?"

The Commission administers, in a complex legal and technical environment, the provisions of numerous regulatory statutes pertaining to oil and gas wells and their operation. These statutes aim at the conservation of oil and gas resources, the protection of correlative rights, and the prevention of waste and pollution. It is not suggested that the interpretation the Commission placed on Rule 38(d)(1) renders it inconsistent with the objectives of any such statute. Exxon claims instead that the Commission was simply bound to apply a literal meaning of the term "first well" and was powerless to apply a constructive or non-literal meaning.

■ The ultimate issue on judicial review of an agency's interpretation of its own rule is whether the agency interpretation is plainly erroneous or inconsistent with the words of the rule. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Public Util. Comm'n v. Gulf States,* 809 S.W.2d 201, 207 (Tex.1991). If not, the agency acted within its discretion in the meaning it assigned to its rule. The agency interpretation here is not inconsistent with the words of the rule if "first well" is understood in the constructive sense applied by the Commission; the interpretation is of course, inconsistent with the text of the rule if "first well" is understood only in a literal sense. The question reduces then to whether the Commission's interpretation is plainly erroneous. The owner's right to a reasonable opportunity to recover a fair share is a constitutionally and statutorily protected right. Assigning a literal meaning to the term "first well" would nullify the right in this case, under the Commission's determinations, while a constructive meaning preserves the right. "[T]here is no right by statute or regulation under a statute, to take the property of one person and give it to another." Robert E. Hardwicke and M.K. Woodward, *Fair Share and the Small Tract in Texas,* 41 Tex. L.Rev. 75, 93–94 (1962) (emphasis in original); *cf. State v. Dyer,*

145 Tex. 586, 200 S.W.2d 813, 815 (1947) (courts will not follow letter of statute when doing so leads away from intent and purpose of legislature, and to conclusions inconsistent with general purpose of statute). We hold the Commission acted within its discretion.

We believe the foregoing answers sufficiently Exxon's corollary contention that the Commission's findings of fact and conclusions of law are inconsistent on their face, and the corollary contention that the agency was bound to comply with the provisions of its own Rule 38 but failed to do so.

■ Exxon contends the 200–foot limitation, fixed by the Commission in its conclusion of law number eight, is not supported by substantial evidence; consequently, the Commission was not authorized to permit the drilling of a replacement well at that distance from Well No. 5. Conclusion of law number eight and finding of fact number twelve are related. In the latter, the Commission determined that a well located less than 100 feet from Well No. 5 would likely not allow the Oryx Unit owner a reasonable opportunity to recover a fair share because of water problems expected within that distance. In conclusion of law number eight, the Commission then fixed the maximum distance for the replacement well at 200 feet from Well No. 5. These determinations derive from the opinion testimony of an expert witness, evidence regarding the history of water problems associated with Well No. 5, and certain documents introduced in evidence and explained by the witness.

The expert witness related Oryx's recent experience with a well on an adjacent tract that also produced from the Emperor (Devonian) Field. That well experienced the same water problems as did Well No. 5 and Oryx drilled on the adjacent tract a replacement well 113 feet from the problem well. Water problems encountered with the replacement well caused Oryx to shut it down. From this experience, the witness concluded that Oryx had made a poor decision in locating the well only 113 feet from the replaced well and that replacement wells in the vicinity should be located "further away."

In the Commission's final order, the agency deleted from the proposal for decision the examiner's recommended finding of fact number eleven, and his conclusion of law number eight. These declared as follows:

11. Any water encroachment problems in the immediate vicinity of Well No. 5 ... are minor and are the result of water communication from higher horizons as a result of [Oryx's] failure to maintain the mechanical integrity of Well No. 5.

\* \* \*

8. [Oryx] is entitled to replace existing Well No. 5 ... with a new well drilled at a location as close as reasonably practical to Well No. 5, but in no event more than 100 feet from the permitted location of Well No. 5.

In lieu of these deleted determinations, the Commission substituted its own finding of fact number eleven and conclusion of law number eight, set out verbatim above. Exxon assails the Commission's substitution of 200 feet for the examiner's 100 feet distance in the absence of any evidence specifically supporting the 200–foot distance.

■ Exxon's substantial-evidence arguments raise several different issues. We should state first that we review the Commissioners' findings of fact and conclusions of law, not those recommended by the examiner in his proposal for decision. Those recommendations do, however, constitute a part of "the record as a whole" that is the object of judicial review concerning substantial-evidence questions. *See* Tex. Gov't Code Ann. § 2001.174(2)(E) (West 1998). Accordingly, an examiner's recommendations may be considered in light of the pertinent evidence and are only

entitled to such value as they intrinsically command when agency decisionmakers depart from them. *See generally* 2 Davis and Pierce, *Administrative Law Treatise* § 11.2, at 178–82 (1994).

There is in the body of evidence nothing that substantiates specifically the 200–foot distance fixed in the Commission's final order. The expert witness' testimony was clear, direct, and unequivocal, however, on the likelihood that water problems in a replacement well in the vicinity would be encountered at a distance of 113 feet or less. His testimony was uncontradicted. Nothing in the pertinent evidence, as we understand it, renders his opinion improbable and nothing raises an issue as to his credibility. *Cf. Fuel Distributors, Inc. v. Railroad Comm'n,* 727 S.W.2d 56, 61 (Tex. App.—Austin 1987, writ ref'd n.r.e.). Yet the examiner in his proposal for decision stated his opinion that the witness' testimony was "speculative." This statement, in these circumstances, appears to reflect mainly the idea that a good deal of testimony involving subterranean matters is perforce uncertain to a degree.

The proposal for decision indicates without question that the examiner fixed the distance at 100 feet because he believed himself bound to do so under the terms of a 1961 Commission memorandum pertaining to replacement wells. The Commission's final order, fixing the distance at 200 feet, indicates of course that the agency disregarded that element of the 1961 memorandum.

In our review of the matter, two important considerations arise. The first is that the distance figures, whether 100 feet or 200 feet, are not "adjudicative" facts for which one expects perfectly explicit support in the body of evidence; they are, instead, "legislative facts" that the Commission was authorized to determine based on its judgment and expertise in light of what the evidence showed with respect to the general situation involving water problems in the vicinity of Well No. 5. The Commission was required in the circum-stances to fix *some* distance, and nothing in the evidence suggests that the agency abused its discretion in the choice it made. *See* 2 Davis and Pierce, *supra,* § 10.6, at 158–59; Bernard Schwartz, *Administrative Law* § 5.7, at 213–15 (1984). The second consideration is that the Commission was not required to be absolutely accurate in calculating the exact point where water problems would in fact be encountered. The agency was entitled to a reasonable margin for error. *Railroad Comm'n v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1027 (Tex.1942). We find in the record nothing that indicates that the change from 100 feet to 200 feet contained an unreasonable margin of error. We hold the Commission determined the matter within the evidence and its authority.

Because it is clear from the record that the Commission did not base its decision on the requirements contained in the 1961 memorandum, we need not discuss Exxon's argument that the replacement-well requirements set forth therein were not satisfied.

■ Exxon contends the Commission lacked authority to issue the permit under Rule 38 because as a matter of law the forty-acre tract vanished as a legal subdivision when it was pooled with other acreage in 1958. Exxon reasons that the forty-acre tract ceased to exist as a legal subdivision because, at common law, pooling results in cross-conveyances of mineral interests among the owners of the pooled acreage, so that all of them acquire an undivided interest in the resulting unit in proportion that their contribution of acreage bears to the acreage of the entire unit. *See Montgomery v. Rittersbacher,* 424 S.W.2d 210, 213 (Tex.1968); Rule 38(d)(3). We believe Rule 38(d)(3) is not applicable because there has been no attempt to divide the 160 acre Oryx Unit. Moreover, Exxon's theory is rejected by Rule 38(d)(1), under which a permit was issued to drill Well No. 6 as a replacement well. Rule 38(d)(1) contemplates *for regulatory purposes* the continued existence of a drill-

site tract, such as the forty-acre tract, after it is pooled. The rule states that "[a]n exception ... is not required for a first well ... on the *drillsite tract* of a *pooled unit.*" (emphasis added).

Exxon contends next that the Commission acted outside the scope of its authority when it issued the permit because

> there is no evidence in this record to quantify whether there is or is not confiscation *as to the 40-acre tract.* All of the evidence relates to the 160-acre Oryx Unit. If it is the 40-acre tract that is entitled to protection from confiscation, then some findings of fact must be made as to the mineral owners' fair share of hydrocarbons beneath the 40-acre tract, and the ability or inability of the existing well to recover those hydrocarbons. There are no such findings of fact in this record.

(emphasis in original).

The Commissioner's finding of fact eleven is that Well No. 6 is necessary to allow Oryx a reasonable opportunity to recover its fair share under the Oryx Unit. That right belongs to the mineral owner, not to the physical acreage. It is undisputed that Well No. 6 will be the sole producing well on the unit, just as Well No. 5 is presently. We do not understand, in light of these undisputed facts, the relevance of the evidence and findings for which Exxon contends.

## ABUSE OF DISCRETION AND DISCRIMINATION

Exxon argues that the Commission, by granting Oryx an exception under Rule 38, disregarded the provisions of Rule 38 applicable to exceptions and fashioned a unique exception for Oryx not available to *other applicants who must comply with* those provisions. We reiterate that the Commission order states on its face that it denied Oryx's application for a permit based on an exception to Rule 38 but issued the permit based on Oryx's demonstrated entitlement to a replacement well under Rule 38(d)(1), which does not re-

quire an exception. It does not appear that Rule 38(d)(1) will be construed differently in like circumstances involving other applicants.

## SUPPLEMENTATION OF THE AGENCY RECORD

■ Exxon moved in the trial court to supplement the agency record by adding two tendered transcriptions of as many public meetings. At these meetings, the Commissioners discussed with the hearings examiner his proposal for decision, the evidence referred to therein, the 1961 memorandum, the meaning of various provisions of Rule 38, and the possible terms of a final order. The second meeting was actually a continuation of the first held two weeks before. Counsel for both Exxon and Oryx gave their views and responded to questions at the second meeting. The transcription of the first meeting does not indicate whether counsel were present. Presumably they were. *See* Tex. Gov't Code Ann. § 2001.061(a) (West 1998). The trial judge overruled Exxon's motion to supplement the agency record, which action Exxon contends was reversible error. It is not contended that the transcriptions reflect any procedural irregularities in the agency proceeding. *Id.* § 2001.175(e).

The Commission was required to include in the record of agency proceedings, and transmit to the reviewing court, "each ... report by the officer presiding at the hearing," a hearings examiner in this instance, together with "all staff memoranda or data submitted to or considered by the hearing [examiner] or members of the agency who are involved in making the decision." *Id.* § 2001.060(6), (7), .175(b). Exxon contends the transcriptions of the two public meetings amount to a "report," "memoranda," or "data."

The "report by the officer presiding at the hearing," referred to in section 2001.060(6), refers primarily to the written proposal for decision required by section 2001.062 of the Texas Government Code. *See id.* § 2001.062. The expression

in section 2001.060(7) regarding "all staff memoranda or data" refers to any communication from agency staff to agency decisionmakers regarding issues of fact, law, or policy. The purpose of section 2001.060(6) and (7) is to enable the parties and their counsel to participate meaningfully in the contested case by assuring that they know the complete and true grounds upon which the agency decision will be made, thereby reducing the chance that a decision might be made on inadequate or inaccurate information. *See* 1 Cooper, *State Administrative Law,* 428–29 (1965). This is one purpose behind the proposal-for-decision practice itself, which gives the parties a right to receive service of a copy of the proposal for decision before a final decision is made, and an opportunity to challenge the proposed decision by filing exceptions and briefs. *See* Tex. Gov't Code Ann. § 2001.062(a)–(d) (West 1998); 2 Cooper, *supra,* at 461.

The transcriptions indicate that the hearing examiner did not communicate to the Commissioners, in the two public meetings, anything not otherwise contained in the record or the proposal for decision itself. We hold there was not error in the trial judge's overruling Exxon's motion.

Finding no error, we affirm the trial-court judgment.