**Opinion issued December 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00036-CV

_____

**HR MARTIN COUNTY LANDFILL, LLC AND THE RAILROAD COMMISSION OF TEXAS, Appellants**

**V.**

**JOHN W. MABEE; JOSEPH GUY MABEE; J.E. AND L.E. MABEE FOUNDATION, INC.; EDWARD FRANK KELTON; BETTY ANN KELTON HOWELL; JEFFREY M. JOHNSTON; AND SANDRA K. JOHNSTON, Appellees**

---

**On Appeal from the 419th District Court**
**Travis County, Texas[1]**
**Trial Court Case No. D-1-GN-21-001100**

---

[1] Per its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court. *See* Misc. Docket No. 22-9115 (Tex. Dec. 20, 2022); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases).

**MEMORANDUM OPINION**

HR Martin County Landfill, LLC applied to the Texas Railroad Commission for a permit to build and operate a commercial facility for disposing of oil and gas waste. The permitting statute requires that such facilities protect groundwater. Property owners near the proposed site—John W. Mabee, Joseph Guy Mabee, J.E. and L.E. Mabee Foundation, Inc., Edward Frank Kelton, Betty Ann Kelton Howell, Jeffrey M. Johnston, and Sandra K. Johnson (collectively, "Protestants")—protested HR Martin's permit application because the facility will sit over the Ogallala Aquifer recharge zone and may pollute the Texas Panhandle's primary water source.

At a contested case hearing, the parties disputed whether the permit must be denied because the caliche layer between the waste storage pits and the groundwater is permeable, or whether an artificial liner and other facility design measures could protect the groundwater and satisfy the permitting criteria. The hearing examiners recommended denial of the permit, but the Commission rejected their recommendation and granted the permit while imposing some additional requirements for the facility's design.

Protestants sought judicial review of the Commission's Final Order, arguing, among other things, that because the Commission added requirements outside of the contested case process, without opportunity for Protestants to challenge their efficacy, there was no evidence the additional measures would protect groundwater.

2

The district court agreed with Protestants and reversed the Final Order, concluding that the Commission granted the permit, "in part," based on "information outside of the administrative record, with no input from Commission technical staff or opportunity for [Protestants] to respond to such information."

Now on appeal, the Commission and HR Martin ask this Court to reinstate the Final Order because Protestants received all the process they were due, the Commission appropriately exercised its discretion in adding the permit requirements, and the Final Order satisfies the substantial evidence standard. We agree with the Commission and HR Martin and thus reverse the district court's judgment and reinstate the Final Order.

**Background**

The Texas Railroad Commission regulates the oil-and-gas industry in the State of Texas. *See* TEX. NAT. RES. CODE § 85.201 (empowering the Commission to "make and enforce rules and orders for the conservation of oil and gas and prevention of waste of oil and gas"). Because waste from industry activity has the potential to pollute surface and subsurface waters, the Commission is authorized to "adopt and enforce rules and orders" and issue permits for the "discharge, storage, handling, transportation, reclamation, or disposal of oil and gas waste." TEX. NAT. RES. CODE § 91.101(a)(4); 16 TEX. ADMIN. CODE § 3.8. Under "Statewide Rule 8," the Commission may issue a permit to dispose of oil and gas waste by any method,

3

including disposal into a pit, if it determines "that the maintenance or use of such pit will not result in the waste of oil, gas, or geothermal resources or the pollution of surface or subsurface waters." *See* 16 TEX. ADMIN. CODE § 3.8(d)(6)(A).

HR Martin applied for a permit under Statewide Rule 8 to operate a commercial facility for the disposal of nonhazardous oil and gas waste in Martin County, Texas. The proposed facility consists of 14 lined disposal cells (or pits) for permanently storing oilfield waste, only one of which will be active and accept waste at any time. The facility also includes related features like waste receiving pits, drying pads, a truck washout pad, and stormwater management ponds. According to HR Martin, the waste received at the facility will include things like drill cuttings, tank bottoms, solids from frac flow-back, and formation sand. Although most of the waste will be dry, anything that is too liquid for immediate disposal will be held in drying pits to drain or evaporate free liquids before being moved to a disposal cell for permanent internment.

The facility site, which HR Martin owns,[2] sits within the recharge zone of the Ogallala Aquifer, where there is no naturally occurring protective barrier between the proposed disposal cells and the groundwater.[3] That is, the caliche layer above

---

[2]      Although it owns the property and applied for the permit, HR Martin plans to transfer the permit to another company called Milestone Environmental Services.

[3]      Described generally, an aquifer recharge zone is the geographical area where water penetrates the ground and replenishes the underground water supply.

the Aquifer recharge zone is permeable and contains "fractures, fissures, cracks, and solutions cavities that allow migration of fluids from the surface to groundwater."

HR Martin proposed a Geosynthetic Clay Liner (GCL) under each of the disposal cells to protect the groundwater. The Commission's Surface Waste Management Manual explains that, in the permitting context, a liner "is a continuous layer of materials that serves to restrict the release or migration of oilfield fluids, oil and gas wastes, or waste constituents." Such liners must have a permeability low enough to contain the material in the pit site, be chemically compatible with the material with which it comes into contact, and be capable of maintaining its integrity over time. The liner can be composed of synthetic or natural materials.

The synthetic GCL liner proposed by HR Martin is a layer of processed clay that can be used as a barrier system to prevent leakage. GCLs are made of two geotextiles with a layer of engineered bentonite (a clay) between them, which, when hydrated naturally, has a low permeability that, according to HR Martin, will stop liquid from leaking out of the disposal pits. As proposed by HR Martin, the GCL would sit atop a layer of densely compacted soil and, in turn, be topped by two high-density polyethlene (HDPE) liners sandwiching a geocomposite drainage layer. HR Martin claimed this liner system was at least as protective as a natural clay layer.

Additionally, HR Martin proposed that the facility's drying pads be constructed with "prepared subgrade, washed rock and an eight-inch concrete liner";

5

that the truck wash pad be constructed with a subgrade GCL, HDPE liner, a geotextile, and a concrete liner; and that the stormwater ponds have a prepared subgrade, a GCL, an HDPE liner, a geonet, and another HDPE liner.

At first, the Commission's technical permitting staff administratively denied HR Martin's application because of concerns that the facility site was "unsuitable for the permanent internment of oil and gas waste" and threatened pollution of the groundwater "should there be any failure in the liner systems for the permanently interned or staged waste." But the staff invited HR Martin to amend the application to include "sustainable engineering designs" and "the necessary structural controls to protect subsurface waters." And after some back and forth over changes to the facility design—including amending the site specifications to increase the distance between the disposal pit floor and the groundwater to no less than 35 feet—HR Martin resubmitted its application. The application was deemed administratively complete, and a draft permit issued.

### Contested case hearing

John W. Mabee and Joseph "Guy" Mabee—the owners of a ranch adjacent to the proposed facility—protested the application. Other property owners near the proposed facility—Edward Kelton, Betty Kelton Howell, Jeffrey M. Johnston, and Sandra K. Johnson—also protested.

Commission staff issued an amended notice setting HR Martin's permit application for a hearing. The stated purpose of the hearing was to "allow the parties to present evidence and consider all issues of fact and law raised in or relevant to" HR Martin's application. The amended notice included the draft permit and the technical plans for the proposed facility's design and operation.

Two administrative law judges and a technical examiner presided as hearing examiners over the contested case hearing, which lasted 14 days. Among other things, the hearing examiners considered evidence of the suitability of the proposed facility site and the protectiveness of HR Martin's proposed liner system, including numerous exhibits and testimony from 16 witnesses. Much of the testimony was technical, including expert testimony from engineers, geologists, and hydrogeologists.

After the hearing and after the record closed, the parties filed written closing arguments. In their closing briefing, Protestants urged denial of HR Martin's permit application but, in the alternative, suggested several revisions to the draft permit which they contended were essential to protect the Ogallala Aquifer if the permit was granted. Those revisions included:

- elimination of the 14-cell waste-on-waste sequenced construction, operation, and closure of disposal pits, . . . including the elimination of the temporary berms;

7

- addition of a ten-foot-thick compacted clay liner with a specified permeability as part of the liner system for all waste management units (truck wash, collection pits, drying pads and disposal pits);

- addition of a liner system for the non-contact stormwater pond.

- addition of a requirement for low permeability (cement stabilized roadbase) pavement around the truck wash, collecting pits, and drying pads; and

- a requirement for prior approval of any GCL product by technical permitting staff before construction.

Ultimately, the hearing examiners issued a proposal for decision (PFD) recommending denial of HR Martin's permit application. The hearing examiners expressed concerns about the suitability of the proposed site, noting that

> the site is located in the Ogallala Aquifer recharge zone with no naturally occurring impermeable barriers such as fat clays between the bottom of the landfill and groundwater to prevent the pollution of the aquifer. Furthermore, . . . the soils are well-drained and permeable, and therefore, not suited for oil and gas waste management and disposal activities.

The hearing examiners found that HR Martin had not shown that "the proposed design and operation of the facility will protect the groundwater from pollution." And they rejected HR Martin's contention that "the liner system and GCL below the landfill cells and pits are adequate to protect the shallow groundwater."

After the PFD was issued, HR Martin tried to address some of the hearing examiners' concerns by agreeing that additional protective requirements could be added to the permit, including requirements that HR Martin obtain staff approval of the GCL specifications before installation; that HR Martin extend the double HDPE

8

liner system along the interior side of the disposal cells' temporary berms; and that HR Martin use a substantially similar liner system under the drying pads as under the collecting/receiving pits. HR Martin did not offer any technical drawings in support of these concessions or ask to reopen the record for new evidence related to any proposed modifications.

### *Commission's Final Order*

The Commission deferred ruling on PFD approval at its first open meeting. But it invited counsel for the parties and the technical examiner to comment and answer questions. The discussion included whether the Commission had previously decided that a lack of naturally occurring impermeable layer required denying a permit, or whether the Commission had previously approved permits when things like GCL, double HDPE liners, leak detection systems, and other design features were used to protect groundwater. The parties expressed opposing views, with counsel for HR Martin stating that GCL is specified in the Commission's permitting manual and that there was evidence of facilities "in the vicinity" that have "similar sorts of GCL Liners." Protestants' counsel took the position that "short of putting . . . a GCL under the entire site," not just the waste pits, there was "no way to protect the Ogallala [A]quifer." The Commissioners took the matter under advisement, with one of the three Commissioners stating that he wanted to "do a

9

little more digging on [his] own" and review the Commission's "case history about sites like this we permitted in the past, what's in public records[.]"

When the Commission later voted at a second open meeting, two of the three Commissioners rejected the hearing examiners' recommendation and granted the permit to HR Martin. The Commissioner who had expressed his desire to look at what the Commission had done in the past confirmed that he had done so, that he had concluded that a permeable caliche layer was not grounds for denying a permit, and that his vote to approve was consistent with three permits granted within a 100-mile radius where there was no naturally occurring clay confining layers and the Commission had allowed GCL as the predominant barrier.

The Commission's Final Order approving issuance of the permit added the three additional requirements HR Martin had agreed to:

- A requirement that [the Commission's] staff approve the [GCL] specifications and type prior to installation.

- A requirement that the liner system be extended along the interior side of the temporary berms so that the liner system for the temporary berms matches the liner system for the entire disposal cell. Staff is authorized to require a reasonable number of additional diagrams to accomplish this goal.

- A requirement that underneath each drying pad there be constructed of a substantially similar liner system to what underlies the collection/receiving pits (two HDPE liners, a GCL, and a leak detection system).

10

The Commission concluded that, "with the additional requirements," the application showed that "the proposed facilities will not result in the pollution of surface or subsurface water," which is the permitting standard under Statewide Rule 8. *See* 16 TEX. ADMIN. CODE § 3.8.

## *Judicial Review in District Court*

Protestants petitioned for judicial review of the Commission's Final Order. They argued that because the additional requirements involved submission of new specifications, the Commission's decision to approve the permit relied on "evidence" outside the record. Because those specifications had not yet been submitted, the approval could not have been based on substantial evidence. And because neither they nor the Commission technical staff had meaningfully reviewed the requirements, requiring any submissions in connection with the permit conditions violated due process and the Administrative Procedure Act ("APA") provision entitling them to respond and present evidence and argument on "each issue involved in the case." TEX. GOV'T CODE § 2001.051(2).

The district court granted the relief Protestants requested, finding that the Commission's "approval of HR Martin's permit application [was] based, in part, on information outside of the Administrative Record, with no input from Commission technical staff or opportunity for the protesting parties to respond to such

information." The district entered a final judgment reversing the Commission's Final Order and remanding for further consideration.

The Commission and HR Martin appealed.

**Analysis**

The Commission and HR Martin contend that, contrary to the district court's finding that "approval of HR Martin's permit application [was] based, in part, on information outside of the Administrative Record, with no input from Commission technical staff or opportunity for the protesting parties to respond to such information," the Commission acted reasonably, based on substantial evidence, and in accordance with applicable law when it issued the Final Order.

**A.    Standard of review.**

We review the Commission's decision in a contested case under the substantial evidence standard of review codified in the APA. *See* TEX. GOV'T CODE § 2001.174; TEX. NAT. RES. CODE § 102.111; *see also R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995) (applying APA's substantial evidence standard to Commission decision under Texas Natural Resources Code). "This is a limited standard of review that gives significant deference to the agency in its field of expertise." *Torch Operating Co.*, 912 S.W.2d at 792. The reviewing court may reverse the Commission's decision only if the appealing party's "substantial rights" have been prejudiced "because the administrative findings,

12

inferences, conclusions, or decisions" are "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole" or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." TEX. GOV'T CODE § 2001.174(2)(E)–(F); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Judicial review of the Commission's decision is based on the administrative record. TEX. NAT. RES. CODE § 102.111; *R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 40 (Tex. 1991).

A court applying the substantial evidence standard of review may not substitute its judgment for that of the agency "on the weight of the evidence on questions committed to agency discretion." TEX. GOV'T CODE § 2001.174; *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999). Substantial evidence review is "highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020); *see also Torch Operating Co.*, 912 S.W.2d at 792 (describing substantial evidence standard as "limited" and entitling agency to "significant deference" in its field of expertise). Substantial evidence in this sense "does not mean a large or considerable amount of evidence" but only "more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Slay v. Tex. Comm'n*

13

*on Envt'l Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied); *see also Mireles*, 9 S.W.3d at 131. The evidence may even "preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Riou*, 598 S.W.3d at 251.

"The question of whether an agency's decision is supported by substantial evidence is a question of law, and we owe no deference to the district court's decision." *Tex. Gen. Land Off. v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130, 135 (Tex. App.—Austin 2014, pet. denied).

## B. The Commission's action was not arbitrary, capricious, or an abuse of discretion.

Protestants argued below, and the district court apparently agreed, that the Commission's decision was arbitrary and denied them due process of law because it relied on outside-the-record facts without giving them an opportunity to assail those facts. The alleged outside-the-record facts included (1) the Commission's findings that the permit conditions, with the three added requirements, would protect the groundwater and (2) one Commissioner's review of the Commission's actions on other applications for sites with similar subsurface conditions. The district court did not say which point supported its judgment that the Commission relied on information outside the record, but neither warranted reversal of the Final Order.

As we have already noted, the Final Order was reversible if the Commission's "findings, inferences, conclusions, or decisions" were "arbitrary or capricious or

14

characterized by abuse of discretion or clearly unwarranted exercise of discretion." TEX. GOV'T CODE § 2001.174(2)(F). An agency decision is arbitrary when it denies parties due process of law, *see Lewis v. Metro Savs. & Loan Ass'n*, 550 S.W.2d 11, 16 (Tex. 1977), or fails to show a connection between the agency decision and the factors that are made relevant to that decision by the applicable statutes and regulations, *see Pub. Util. Comm'n of Tex. v. Gulf States Utils. Co.*, 809 S.W.2d 201, 202 (Tex. 1991).

In a contested case, the APA affords each party an opportunity "to respond and to present evidence and argument on each issue involved in the case." TEX. GOV'T CODE § 2001.051(2). Likewise, "due process requires that parties be accorded a full and fair hearing on disputed fact issues." *Off. of Pub. Util. Couns. v. Pub. Util. Comm'n*, 185 S.W.3d 555, 574 (Tex. App.—Austin 2006, pet. denied) (describing due process, at minimum, as "notice and an opportunity to be heard at a meaningful time and in a meaningful manner"); *see also Dep't of Pub. Safety v. Monroe*, 983 S.W.2d 52, 56 (Tex. App.—Houston [14th Dist.] 1998, no pet.). But only one adequate hearing is required in an administrative proceeding. *See Browning-Ferris, Inc. v. Johnson*, 644 S.W.2d 123, 127 (Tex. App.—Austin 1982, writ ref'd n.r.e.). The Commission has discretion to grant or refuse a further hearing on matters that were already before it in an earlier hearing, and unless there is an abuse of discretion the courts do not interfere. *Id.* at 128; *Maverick Cnty. v. R.R.*

*Comm'n of Tex.*, No. 03-14-00257-CV, 2015 WL 9583873, at *13 (Tex. App.—Austin Dec. 29, 2015, pet. denied) (mem. op.).

Here, the parties received notice and amended notice of the contested case hearing. The amended notice stated that the hearing's purpose was "to allow the parties to present evidence and consider all issues of fact and law raised in or relevant to [HR Martin's] Application." And it listed the issues for hearing as including, but not limited to, the matters asserted in HR Martin's hearing request and "[a]ny other issue raised in the pleadings, evidence, or argument that are necessary for the Commission to render a final decision on the merits of this case." HR Martin's hearing request, in relevant part, tied the hearing's purpose to consideration of its application under Statewide Rule 8 for

> a commercial oil and gas waste disposal facility with 14 commercial oil and gas waste disposal pits, to store, handle, treat, and/or dispose of certain oil and gas wastes in a series of collecting/receiving and/or collecting/drying pits, and the permanent internment and disposal of solid wastes in a series of disposal cells, or pits.

The hearing proceeded over 14 days and included multiple rounds of written briefing and the opportunity for all parties to present and contest evidence on the characteristics of the subsurface underlying the site, including the existence and relative permeability of the caliche layer above the Aquifer, and the protectiveness of HR Martin's proposed liner system. After the hearing concluded, the Commission added three requirements to the permit—namely:

16

1. A requirement that staff approve the [GCL] specifications and type prior to installation.

2. A requirement that the liner system be extended along the interior side of the temporary berms so that the liner system for the temporary berms matches the liner system for the entire disposal cell. Staff is authorized to require a reasonable number of additional diagrams to accomplish this goal.

3. A requirement that underneath each drying pad there by constructed a substantially similar liner system to what underlies the collecting/receiving pits (two HDPE liners, a GCL, and a leak detection system).

Although Protestants initially challenged all three requirements as relying on facts outside the record, they clarified in oral argument before this Court that they no longer complain of the first requirement for HR Martin to obtain staff approval of the GCL specifications and type before installation. Their complaint of outside-the-record facts thus regards only the second and third requirements for the liner system to extend along the interior side of the disposal cell temporary berms and underneath each drying pad. With respect to these two requirements, Protestants argue that the permit effectively implements HR Martin's post-hearing offer to revise the facility design but without any evidence of what those designs would entail and without any opportunity for Protestants to challenge their efficacy in protecting groundwater. We disagree.

"In construing orders of an administrative agency, we apply the same rules as when we interpret statutes." *See Off. of Pub. Util. Couns. v. Tex.-N.M. Power Co.*, 344 S.W.3d 446, 450–51 (Tex. App.—Austin 2011, pet. denied). One such rule is

17

that we apply the plain meaning of the language used in the agency's order. *See Tex. Indus. Energy Consumers v. Pub. Util. Comm'n of Tex.*, 2021 WL 351884, at *3–4 (Tex. App.—Austin Aug. 11, 2021, pet. denied) (mem. op.). As HR Martin asserts, the Final Order plainly connects the requirements for additional liners along the interior side of the temporary berms and under the drying pads to the record evidence of "the protective adequacy of those *matching* design features as employed, and approved by the Commission, elsewhere in the facility." That is, the Commission "did not invent new facility features out of whole cloth and order their implementation." Instead, by using the words "extend," "match," and "substantially similar" in its directives, the Commission "ordered that *existing, already considered, already reviewed* features be *replicated* to provide the same form and degree of groundwater protection that those same features provide elsewhere in the facility." *See, e.g.*, Extend, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/extend, accessed Dec. 19, 2024 (defining "extend" as "to cause to reach"); Match, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/match, accessed Dec. 19, 2024 (defining "match" as "to put in a set possessing equal or harmonizing attributes" and "to cause to correspond"); Similar, MERRIAM-WEBSTER.COM DICTIONARY, https://www.meriam-webster.com/dictionary/similar. accessed Dec.

19, 2024 (defining "similar" as "having characteristics in common" and "alike in substance or essentials").

Several opinions from the Austin Court of Appeals, whose precedent is binding in this transferred appeal, are instructive in this regard. *See* TEX. R. APP. P. 41.3 ("In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court.").

*Johnson* concerned a permit from the Texas Department of Health for a solid waste landfill. 644 S.W.2d at 124. The contested case hearing examiners issued two proposals for decision, both recommending that the permit be granted. *Id.* "Instead of adopting either proposal, the Commissioner of Health scheduled another set of oral arguments during which no new evidence was permitted to be introduced," and then issued the permit subject to several terms and conditions. *Id.* One condition limited the height of the fill to a lower elevation than requested in the permit application. *Id.* In a special provision, the Commissioner also ordered the permittee to submit a revised completion plan before beginning excavations.[4] *Id.* at 125.

---

[4]    "A landfill completion plan is a constructed map showing the final contour of the entire landfill to include internal drainage and side slopes plus accommodation of

19

On judicial review, the protesting parties argued that, by requiring revisions to the completion plan after the hearing, the Commissioner violated their due process right to have those issues decided in a contested case. *Id.* at 126. The Austin court disagreed because the "subject matter treated in special provision E(2) received intensive public discussion during the five days of hearing." *Id.* at 128. The court reasoned that the permit application had included a completion plan, which the Commissioner required modification of. *Id.* But the required modification did not violate due process because "the original hearing was adequate" and "the matters described in the landfill completion plan were fully and adequately explored in the extensive public hearings held before the hearing examiner." *Id.*

The Austin court reviewed another solid waste landfill permit in *North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 448 (Tex. App.—Austin 1992, no writ) ("*North Alamo I*"). There too, the Commissioner added a special provision to the permit after the evidentiary hearing was closed. *Id.* at 451. The special provision deemed the "seasonal high[-]water table beneath the proposed site" to be three-feet deep, rather than six, and required that "the liner design and soil balance sheet . . . be revised accordingly." *Id.* at 450. Several parties protested that the special provision required "material alterations of the landfill design plans[] but

_____

surface drainage entering and departing the completed fill area plus areas subject to flooding due to a 100[-]year frequency flood." *Johnson*, 644 S.W.2d at 125 n.3.

20

failed to afford [them] any opportunity to challenge the revisions, thus denying them due process of law." *Id.* The court again disagreed, holding that no additional hearings were required. *Id.* at 451. In so holding, the court observed that the protesting parties had participated in the hearing that established the three-foot high-water table, and addressed, among other things, the design of the landfill liner. *Id.* Therefore, the protesting parties had received due process of law. *Id.*

The same reasoning applied in *Maverick County*, where the applicant sought a permit related to surface coal mining. 2015 WL 9583873, at *1. The permitting rules required applicants to provide a plan for reclamation of lands within the permit area, including "a general plan for each proposed sedimentation pond." *Id.* at *12. The applicant submitted detailed design plans for three sedimentation ponds and general design plans for four others, based on the anticipated order of construction. *Id.* The Commission granted the application and approved the permit with a condition requiring the applicant to submit detailed design plans for the four future ponds before beginning construction on them. *Id.* The protesting parties argued that because the condition requiring the applicant to "submit design plans in the future . . . precluded [them] from participating in the decision, effectively circumventing their right to a hearing on the adequacy of the designs and abrogating their due process rights." *Id.* at *13. Again, the court disagreed and concluded that the protesting parties' due process rights were not violated by the Commission's

21

decision to approve the permit before the applicant submitted detailed design plans for all sedimentation ponds. *Id.*

Protestants try to distinguish these cases by pointing to the "highly technical" nature of the post-hearing design modifications required by the Commission and the importance of the Aquifer that may be polluted. While we agree with Protestants that the stakes are high, we cannot say whether the engineering required for an oil-and-gas waste landfill is more or less technical than what is required for the solid waste landfills in *Johnson* and *North Alamo* or the sedimentation ponds in *Maverick County*. And regardless, the degree of technical complexity and importance are not distinctions we find in the case law.

As the transferee court, we are obliged to follow the Austin court's precedent. *See* TEX. R. APP. P. 41.3; *see also Mitschke v. Borromeo*, 645 S.W.3d 251, 258 n.12 (Tex. 2022) (emphasizing that "transferee courts have no authority to deviate from the procedural requirements of Rule 41.3" and "must follow the transferor court's jurisprudence just as it must follow a precedent of [the Texas Supreme Court]"). Applying these cases, we are compelled to conclude that Protestants received the administrative process that was due. Extending a matching double-liner system to the interior side of the temporary berms means using the same type of liner and anchoring system the Commission reviewed and approved for use in the permanent, exterior berms surrounding each cell. Likewise, constructing a liner system under

22

the drying pads that matches the liner system under the receiving pits means using the same type of liner system as already designed, reviewed, and approved for use under the receiving pits. In both instances, Protestants participated in the hearing that established the features of the liner systems and addressed, among other things, their protective qualities. We therefore conclude that the Commission did not violate the APA or Protestants' due process rights in approving the permit with the three additional requirements, and we hold the district court erred in reversing the Final Order on this basis.

Likewise, to the extent the district court reversed the Final Order based on one Commissioner's statement that he had looked at other permits within the vicinity as precedent, that was also error. The Commissioner's statements did not require any further hearing. We review the validity of the Final Order according to its language and the basis on which it purports to rest. *See Smith v. Hous. Chem. Servs., Inc.*, 872 S.W.2d 252, 266–67 (Tex. App.—Austin 1994, writ denied) ("The Commission's final decision purports to rest solely on the findings of fact and conclusions of law that accompany the decision. We must judge the validity of the decision according to the basis upon which it purports to rest."); *Tex. Utils. Elec. Co. v. Pub. Util. Comm'n*, 881 S.W.2d 387, 416 (Tex. App.—Austin 1994), *aff'd in relevant part*, 935 S.W.2d 109 (Tex. 1996) (courts "judge the agency order on the basis on which it purports to rest, and the mental processes of individual commissioners are

23

immaterial to judicial review"). The Commissioner's "thought processes or motivations" are "irrelevant in the judicial determination whether the [Final Order] is reasonably sustained by appropriate findings and conclusions that have support in the evidence." *City of Frisco v. Tex. Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. App.—Austin 1979, writ ref'd n.r.e.); *see also Occidental Permian Ltd. v. R.R. Comm'n of Tex.*, 47 S.W.3d 801, 809 (Tex. App.—Austin 2001, no pet.) (explaining that even if the agency order referred to facts outside the record, it would still be affirmed because the Commission provided a reasonable basis for its decision; there was a clear connection between the decision and the governing standards; and the protesting party had not shown it was denied due process).

## C. Substantial evidence supports the Final Order.

The substantial evidence standard codified in the APA asks whether there is some reasonable basis in the record for the Commission's action. *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 185 (Tex. 1994). As the reviewing court, we are concerned only with the reasonableness of the administrative order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984). We agree with the Commission that the Commission acted reasonably based on the record before it with respect to the challenged findings, and thus the district court erred to the extent it reached a contrary conclusion.

24

### 1. The additional requirements.

The contested case hearing produced evidence of the characteristics of the subsurface underlying the site, including the existence and relative permeability of the caliche layer above the Aquifer; the depth of the water table; and the prevalence of significant aquifer recharge features at the site. Such evidence included subsurface boring logs, soil samples, field documentation from borings, and the expert testimony of geologists and geoscientists.

There was also evidence of the protectiveness of GCLs as substitutes for naturally occurring clay liners to prevent groundwater pollution, the potential for leakage, and the adequacy of operational controls to preclude groundwater pollution in unlined areas of the facility. For example, Ken Schreuder, the project manager for the application with 30 years' experience with various aspects of landfill design and construction (including liner installation), testified that GCL has the characteristics of a two-foot layer of natural clay, about the long life-expectancy of GCL, and about how GCL can be tailored for specific applications. He also confirmed that the GCL selection for the site will be based on engineering and compatibility with the operating environment. Pat Behling, who holds a master's degree in environmental engineering and has 35 years' experience, testified that properly selected GCL can be superior to natural clay, that a naturally occurring impermeable barrier is not required, and that the absence of a confining layer can be engineered around, even

over shallow groundwater. Behling also testified that based on engineering design, operating controls, and information in the application, the criteria of Statewide Rule 8 are satisfied.

Protestants contested some of this evidence and pointed out several features that they claimed made HR Martin's permit application inadequate. For example, they pointed out that several Commission permits in the past have included provisions requiring staff approval of GCL, in contrast to the draft permit here. They solicited testimony that the original plan for the temporary berms was inadequate because it relied on a single lining instead of a double-liner system. And they pointed out that there was no GCL at all under the drying the pads.

The Commission, as the sole judge of the weight of the evidence and the credibility of the witnesses, imposed the additional protective requirements in the areas where Protestants identified weaknesses in the original facility design. *Central Power & Light Co./Cities of Alice v. Pub. Util. Comm'n of Tex.*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). The additional requirements replicate existing facility design features, and there was more than a scintilla of evidence of those features' groundwater-protective capability as utilized in their original contexts. We disagree with Protestants that the record had to show the existing protective features will also protect the groundwater when replicated elsewhere in the facility to satisfy substantial evidence review.

26

In *Exxon Corp. v. Railroad Commission of Texas*, the Austin Court of Appeals recognized similar agency action as a reasonable exercise of the Commission's authority. 993 S.W.2d 704, 705–06 (Tex. App.—Austin 1999, no pet.). There, Exxon sought judicial review of the Commission's Final Order in a contested case in which the Commission granted Oryx Energy Company (Oryx) permission to drill a replacement well on a forty-acre tract. *Id*. The sole existing well had deteriorated due to water encroachment. *Id*. at 706. When considering Exxon's appeal, the court noted that the PFD issued by the hearing examiners recommended setting the distance between the original and replacement wells at no more than 100 feet, but the Commission had expanded the distance to 200 feet. *Id.* at 709–10. Exxon contended the 200-foot limitation was not supported by substantial evidence. *See id.* at 709. And nothing in the record substantiated the 200-foot distance the Commission had imposed. *Id.* at 710. The experts' testimony, however, was that there was a likelihood of encountering the same water problems that had plagued the original well at less than 113 feet. *Id.*

In reviewing the Commission's decision, the Austin court noted that agency discretion in its field of expertise was integral to the decision. "The distance figures, whether 100 feet or 200 feet, [are facts] that the Commission was authorized to determine based on its judgment and expertise in light of what the evidence showed with respect to the general situation involving water problems in the vicinity of [the

original well." *Id.* Further, the Commission had to "fix *some* distance, and nothing in the record suggest[ed] that the agency abused its discretion in the choice it made." *Id.* (emphasis in original). The Court also noted that the Commission did not have to be "absolutely accurate in calculating the exact point where water problems would in fact be encountered," and nothing in the record indicated that the change from 100 feet to 200 feet contained an unreasonable margin of error. *Id.* Thus, the court concluded, the Commission "determined the matter within the evidence and its authority." *Id.*

Like in *Exxon*, the Commission here decided what parameters would provide the necessary safeguards for granting the requested permit. Like in *Exxon*, the resolution ordered by the Commission differed from what the parties and the hearing examiners recommended. And like in *Exxon*, we hold the Commission imposed the additional requirements based on the evidence and within its authority.

### 2. Operational and financial security requirements.

In the district court, Protestants also challenged whether (1) substantial evidence supported the Commission's financial security findings considering the post-hearing requirements for modifications of the facility design and (2) substantial evidence showed that Milestone, the operator to whom HR Martin planned to sell the permit, accepted the permit conditions.

Regarding the financial security findings, Protestants argued that there was "no evidence that revised financial security calculations or a revised closure cost estimate were submitted to account for the proposed modifications to the facility, despite major changes in design due to the additional conditions." The financial security requirements relate to facility closure costs, written under seal by a professional engineer. *See* 16 TEX. ADMIN. CODE § 3.78. Per the Commission's requirements, HR Martin provided a professional engineer's closure cost estimate in its application; this estimate includes a 10% contingency figure, resulting in financial security requirements set out in findings of fact, which HR Martin satisfied.

Protestants' assertions about increased closure costs fail to consider that of the Commission's added permit conditions, only the drying pad's liner would be an additional disposal expense at closing. The first requirement for the GCL to be approved by staff is already taken into consideration, and second requirement for lining the interior side of the temporary berms will not be present at closure because the temporary berms will have been removed. The Commissioner could reasonably conclude that given the relative size of the drying pad, any additional cost to remove the liner would be covered by the over $600,000 contingency. But if Commission staff were to determine that a larger financial security is needed, the terms of the permit expressly recognize staff's authority to require more. This evidence provided a reasonable basis for the Commission's decision that the financial security

requirements were satisfied and thus meets the substantial evidence standard. *See Tex. Gen. Land Office*, 449 S.W.3d at 135.

And as for any lack of evidence that Milestone agreed to the Commission-added requirements, we disagree that is a basis for setting aside the Commission's Final Order. Milestone's agreement to the additional requirements is irrelevant. Regardless of the operator, the limitations on the permit must be complied with subject to Commission enforcement. *See* TEX. NAT. RES. CODE § 91.003(a) (conferring Commission with enforcement authority); *see also id.* § 85.013 (entrusting enforcement of Commission's rules and orders to state employees).

**D.    The Commission did not need technical staff's input before imposing the additional requirements.**

The district court concluded that the Commission's Final Order was reversible because the added conditions were not reviewed by the technical staff before they were included in the permit. Essentially, this is a conclusion that because the Commission did not have the advice of its own experts, the Final Order was not entitled to the weight normally accorded to determinations of technical questions within an agency's expertise. And it is error.

The power of decision resides in the agency and not in the staff. *City of Frisco*, 579 S.W.2d at 72. The Commissioners are the Commission. TEX. NAT. RES. CODE § 81.01005 ("The commissioners are known collectively as the 'Railroad Commission of Texas.'"); *see also* 16 TEX. ADMIN. CODE § 1.2 (instructing that the

30

Commission acts "through a majority of the Commissioners or through a Commission employee to whom the Commissioners have delegated authority"); *id.* § 1.126(a) ("A final decision or final order . . . shall be signed by two or more Commissioners"). The Commission is given broad discretion to regulate "matters related to oil and gas production," *Tex. Citizens for a Safe Future*, 336 S.W.3d at 630, including the adoption and enforcement of rules and orders and the issuance of permits for the "discharge, storage, handling, transportation, reclamation, or disposal of oil and gas waste." TEX. NAT. RES. CODE § 91.101(a)(4).

In the exercise of its discretion, the Commission may "reject the [hearing] examiner's proposed findings of fact and conclusions of law in whole or in part." 16 TEX. ADMIN. CODE § 1.123(a). And it may reject the recommendations of its staff. *City of Frisco*, 579 S.W.2d at 72. As the Austin court has explained,

> An agency staff only serves the agency. Staff recommendations may be accepted in whole or in part by the agency, or such recommendations may be rejected outright. It is the order of the agency that is reviewed by the courts, not the recommendation of the staff.

*Id.* In other words, staff's recommendations are part of the record before the Commission. *See id.* But it is the Commission's order, not the staff recommendation, that is reviewed. *See id.* And it is the Commission, acting through the Commissioners, to whom deference is given under the substantial evidence standard of review. *See id.*

31

Here, the role remaining for staff is a matter of enforcement. And the Commission's three additional requirements for the permit appropriately call for staff, in its enforcement role, to ensure that the GCL, temporary berm interior liner system, and drying pads comply with Statewide Rule 8. *See, e.g.*, *North Alamo Water Supply Corp. v. Tex. Dep't of Health* (*North Alamo II*), 839 S.W.2d 455, 458 (Tex. App.—Austin 1992, writ denied) ("The enforcement of the permit conditions is committed to agency expertise and discretion; if the disputed revisions do not comply with the terms of the permit and its special provisions, the Department is authorized to address the non-compliance."); *North Alamo I*, 839 S.W.2d at 451 ("The Department's role is limited to ensuring that the revisions comply with the applicable statutes and regulations.").

## Conclusion

Constrained by a standard of review that is highly deferential to the Commission's decision and precedent from the Austin court in this transfer case, we have concluded that the district court's reasons for setting aside the Commission's Final Order were erroneous. We therefore reverse the district court's judgment and reinstate the Commission's Final Order.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.