CITY OF FRISCO, Appellant,

v.

TEXAS WATER RIGHTS COMMISSION et al., Appellees.

No. 12815.

Court of Civil Appeals of Texas, Austin.

March 14, 1979.

Rehearing Denied April 11, 1979.

Barry K. Bishop, William Y. Fowler, IV, Clark, Thomas, Winters & Shapiro, Austin, for appellant.

John L. Hill, Atty. Gen., B. D. Skip Newsom, Jr., Asst. Atty. Gen., Austin, for Texas Water Rights Commission.

Frank R. Booth, Paul G. Gosselink, Booth, Lloyd & Simmons, Austin, for City of Denton, Texas.

James W. Wilson, Stubbeman, McRae, Sealy, Laughlin & Browder, Austin, for City of Dallas.

SHANNON, Justice.

The City of Frisco appeals from judgment of the district court of Travis County that affirmed an order of the Texas Water Rights Commission, now the Texas Water Commission. The Commission's order granted applications of the Cities of Dallas and Denton for permits to appropriate water from the proposed Aubrey Reservoir Project on the Elm Fork of the Trinity River. The order also denied applications of Frisco and others to appropriate water from the same project. We will affirm the judgment.

The Aubrey Project will be constructed by the United States Army Corps of Engineers in Cook and Grayson Counties. The Project consists of the proposed Aubrey Dam, the lake that it will form, and the increase in storage capacity that will result in Lake Lewisville, an existing downstream reservoir. Lake Aubrey will have a conservation storage capacity of 797,600 acre-feet, and the conservation storage capacity of Lake Lewisville will be increased by 177,600 acre-feet. The increase in capacity in Lake Lewisville will occur because the construction of the Aubrey Reservoir will provide 177,600 acre-feet additional flood control storage that Lake Lewisville will no longer have to provide.

The Commission received six competing applications for the storage and diversion rights to be created by the Aubrey Project: Dallas, 591,704 acre-feet (seventy-four percent of the storage capacity of Lake Aubrey); Denton, 207,896 acre-feet (twenty-six percent of Lake Aubrey); Frisco, 68,000 acre-feet; Collin-Denton County Water and Sanitation District, 6,500 acre-feet; Gainesville, 42,000 acre-feet; and the Colony Municipal Utility District No. 1 of Denton County, 30,000 acre-feet.

The Commission granted the applications of Dallas and Denton and denied all of the other applications. The permits issued to Dallas and Denton, among other things, authorized Dallas to divert and use seventy-four percent of the storage capacity of Lake Aubrey and Denton to divert and use the remaining twenty-six percent of the storage capacity. Both permits contained the statement: "Permittee supplies water to cities and other public entities, and this permit is issued on the assumption that permittee will continue the policies under which such service is provided."

Only Frisco perfected an administrative appeal of the Commission's order. The Commission was of the opinion, as reflected by its findings of fact, that Frsico had water supply sources to furnish its reasonable future water needs, independent of water from Lakes Lewisville or Aubrey.

Frisco attacks the judgment by six points of error. The point critical for Frisco is that the district court erred in sustaining the Commission's order for the reason that the Commission's finding that Frisco has sufficient water supply to satisfy its future requirements is arbitrary and "contrary" to substantial evidence.

■ An appeal from an order of the Commission is governed by the substantial evidence rule. *City of San Antonio v. Texas Water Commission,* 407 S.W.2d 752 (Tex.: 1966). A statement of the law relating to judicial review of agency orders is found in a recent opinion of this Court, *Mutual Building and Loan Association v. Lewis,* 572 S.W.2d 771 (Tex.Civ.App.1978, no writ), and need not be repeated in this opinion.

Frisco is a general law city located in Collin and Denton Counties approximately twelve miles north of Dallas and about twenty miles northeast of the Dallas-Fort Worth Regional Airport. Frisco is three miles from the deep water of Lake Lewisville. One of the sloughs of Lake Lewisville extends within the boundaries of Frisco. Although Frisco's land area, and the land which the city controls, is about 56,832 acres, its 1970 population was 1,845 persons and its estimated 1976 population was 3000 persons.

Frisco's large land area is explained by the fact that prior to the hearing, the city had entered into an aggressive strip annexation program by which it annexed a ten-foot ribbon of land many miles along four highways.[1] The area thus staked out includes several small unincorporated communities and much rural countryside.

As of January, 1976, Frisco's source of water consisted of five wells. Harold Bacchus, Mayor of Frisco, testified on cross-examination that the city had at the time of hearing a water supply from its wells to satisfy the needs of a population of 5000 to 7000 persons. The wells, however, do not furnish a dependable future water supply.

---

1. Frisco's representative conceded in testimony before the Commission that Frisco's strip an-

nexation method would be illegal under current law, although it was lawful when undertaken.

Frisco's evidence was that it will have to deepen two of its wells because the water table has lowered. Should Frisco have to deepen the wells, the old casing would have to be removed and new casing substituted. There was evidence that the level of ground water will continue to decline.

Probably in view of that fact, the governing body of Frisco entered into a contract with the City of McKinney for the purchase of two million gallons daily of treated water from Lake Lavon to supplement the Frisco water supply. The contract with McKinney is for twenty-five years, and is renewable for another twenty-five years. The pipeline to take the water from McKinney to Frisco was nearly completed at the time of the hearing. Although that pipeline has a limited capacity, Frisco's engineering witness testified that as Frisco and McKinney grow closer together, pipelines of greater capacity will be constructed. It is true, as contended by Frisco, that McKinney's obligation under the contract to supply water to Frisco is predicated upon the amount of water North Texas Municipal Water District makes available to McKinney.

The City of Dallas aptly characterizes Frisco as ". . . a small North Texas town with large ambitions." Frisco placed in evidence before the Commission the testimony of two witnesses, its mayor and an engineer. Most of the testimony concerning future growth was given by the mayor. With respect to its future growth, and corresponding need for water, the mayor testified that Frisco's population will be about 18,000 in 1980 and about 65,000 in 2000. The mayor's belief in Frisco's "manifest destiny" was predicated upon its "unique development program" that the mayor explained to the Commission.

The Commission heard and considered Frisco's evidence of its need for water for its projected expansion. The Commission, as was its right, refused to credit that evidence. The Commission may have concluded that Frisco's projected growth was more a gleam in its mayor's eye than a reasonable probability. More specif-

ically, the Commission obviously believed that Frisco's growth would be much more moderate than that claimed by its mayor. The Commission reasonably believed that the water supplied by the McKinney contract would be sufficient to meet Frisco's reasonable future needs. In addition, Frisco has the benefit of the water supplied by its wells. The mayor admitted on cross-examination that the well water supply alone will meet the needs of a population of 5000 to 7000, a number approximately double Frisco's population at the time of the Commission's hearing.

Since reasonable minds could have arrived at the conclusion that the Commission reached in entering its order, Frisco's point of error two is overruled. *Auto Convoy Company v. Railroad Commission of Texas,* 507 S.W.2d 718 (Tex.1974).

Because Frisco has failed to meet its burden of showing that the Commission's order denying it a permit to appropriate water was not supported by substantial evidence, reason suggests that Frisco has no justiciable interest in the allocation of the waters of Lake Aubrey by the Commission among other applicants. Seemingly, Frisco should be in no better position to challenge the Commission's award to the other cities than would be any other member of the public. Nevertheless, we have concluded, and all parties to the appeal agree, that the rule is otherwise. *City of San Antonio v. Texas Water Commission,* 407 S.W.2d 752 (Tex. 1966). The rule is stated by Professor Davis: "To start the judicial machinery in motion, a plaintiff should be required to assert an interest of his own, but once the judicial machinery is in motion, any party should be allowed to argue for what he asserts to be desirable, including the interest of other private parties and the interest of the public." Davis, *Administrative Law Treatise* § 22.21, at 786 (Supp.1970).

Frisco claims in point of error one that the court erred in affirming the Commission's order because the order, in granting seventy-four percent of the water to Dallas even though its supply is sufficient for its reasonable future needs, is arbitrary and

not supported by substantial evidence. We do not understand Frisco to attack the judgment affirming the order granting twenty-six percent of the water to Denton.

At the time of the Commission's hearing, Dallas had several sources of water. Lake Lewisville is on the Elm Fork of the Trinity and is south of the proposed Lake Aubrey. Dallas has rights in Lake Grapevine on Denton Creek, a tributary of the Elm Fork of the Trinity. Dallas has acquired additional water supplies at Lake Ray Hubbard, Lake Tawakoni, and Lake Palestine.

Frisco concedes that without water from Lake Aubrey, Dallas and its client cites have a water supply to meet their combined need only until about the year 2000. Frisco claims, however, that Dallas does not intend to honor its contractual commitments to its city customers. Frisco argues that Dallas, freed of its commitments to its client cities, has water resources, excluding water from Lake Aubrey, to suffice until about the year 2050.

Dallas' water supply in Lakes Hubbard, Tawakoni, and Palestine is more expensive than the Elm Fork supply because water from the eastern lakes must be pumped to Dallas, whereas water from the Elm Fork supply reaches Dallas' treatment plants by gravity flow. The higher cost of the water to Dallas from the eastern lakes was an important consideration for the Commission in considering the allocation of rights to the water of Lake Aubrey.

The Aubrey Reservoir has been a consideration in Dallas' water planning since before 1960. Dallas and Denton contracted in 1962 to develop the project as a joint effort with costs and benefits shared on a seventy-four percent/twenty-six percent basis. In 1969, the Commission designated Dallas and Denton as co-operating local sponsors for the Aubrey Project. Dallas and Denton have entered into negotiation with the Army Corps of Engineers to acquire the conservation storage which will be made available by construction of the Aubrey Reservoir. The Commission found that Dallas and Denton have the necessary administrative, legal, and technical expertise to provide for the full and successful development of the Aubrey Reservoir. Those cities have the financial resources necessary to adequately finance participation in the Aubrey Project as well as the development of treatment and distribution facilities required for maximum utilization of the water by cities within the basin.

Dallas' case for utilization of the waters of Lake Aubrey called for "overdrafting" the dependable yield of the reservoir. "Overdrafting" refers to the practice of withdrawing more water from the reservoir than its dependable yield. As we understand, the term "dependable yield" refers to the water demand that can be applied to a reservoir throughout the most severe historical drought without experiencing shortages and is usually expressed in acre-feet per annum or million gallons per day. As explained by the parties, the dependable yield of a reservoir is the amount of water that could have been withdrawn from the reservoir on a continuous basis during the "critical drought" and that would have emptied the reservoir just prior to its replenishment by drought-breaking rains.

If a city has a single reservoir, the withdrawal rate should be such that it does not exceed the dependable yield. The logic underlying a dependable yield operation disappears when a city has a multiple reservoir system with delivery costs from some reservoirs substantially exceeding the delivery costs from other reservoirs. In that case, if the total dependable yield of all of a city's reservoirs equals or exceeds the city's total water demands, and if the city has sufficient operational flexibility, substantial savings may be realized by "overdrafting" or taking more than the dependable yield from the reservoirs with less delivery expense. The reasoning is that when the city experiences a severe drought, it can fall back upon water from the more expensive reservoirs that have been left untouched. The fact that there are more non-drought years than drought years enables the city to realize substantial long-term savings from such an "overdrafting" operation.

Dallas presently operates its Elm Fork system in such an "overdraft" operation, and as the water demand increases in the future, Dallas will increase its "overdraft" on the Elm Fork. Lake Aubrey figures in Dallas' future plan for increased "overdrafting" on the Elm Fork.

Frisco claims that Dallas' "overdrafting" plan allows Dallas ". . . to hoard the public waters of Texas while its smaller, less affluent neighbors thirst." Frisco suggests that the "overdrafting" concept allows the water in Lake Tawakoni and Lake Palestine, not presently being used by Dallas, to "waste" in violation of Tex. Water Code §§ 5.268, 11.002(5), 11.025, 11.026, and 11.302 (Supp.1978), and *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642 (Tex. 1971).

Texas Water Code § 5.268 adjures the Commission to administer the law ". . . so as to promote the judicious use and maximum conservation . . . of water." Texas Water Code §§ 11.002(5), 11.025, 11.-026, and 11.302 assert the principle in varying ways that water rights shall be put to "beneficial use." "Beneficial use" is defined in the Code to mean ". . . use of the amount of water which is *economically necessary* for a purpose authorized by this chapter, when *reasonable intelligence* and *reasonable diligence* are used in applying the water to that purpose." Tex. Water Code § 11.002(5). (Emphasis added) In *Texas Water Rights Commission v. Wright, supra,* the Supreme Court construed the statute that then allowed for cancellation of a permit for nonuse, Tex. Rev.Civ.Stat.Ann. art. 7519a. In the opinion the Court stated:

> "Common to the law of the western arid regions and of appropriation law generally is the idea that non-use of appropriated waters is a waste of the water. Once water is appropriated, its availability to another user is reduced or defeated, and if the permittee does not use a substantial portion of it the water will run unused into the sea. A workable system of appropriated waters has produced the general rule that the beneficial use of

waters is the conservation of the resource, whereas, the non-use of appropriated waters is equivalent to waste."

The Commission recognized and accepted the "overdrafting" concept in its findings. The Commission was of the view that diverting more than the dependable yield from the Aubrey Project by Dallas and Denton is ". . . economically beneficial and conserves public water where the diverter has additional alternative water supplies which produce a dependable yield equal to the total diversion demand." The Commission found that "[m]aximizing the appropriation of water from Aubrey Lake during periods of occasional surplus is reasonable and promotes the public welfare because Aubrey Lake would provide a source of municipal water which is relatively near Dallas and Denton and substantial savings could be passed on to the public due to the relatively lower pumping costs for water used from this source."

■ The "overdraft" operation as approved by the Commission in this case results in the beneficial use of the total water supply of Dallas, a supply that serves the greatest population center of North Texas. In our view, the "overdraft" concept, under the facts of this case, results not in waste, but instead in the judicious use and maximum conservation of water.

The Commission did not attempt to resolve the dispute between the applicants concerning dependable yield of Lake Aubrey. The Commission recognized that the value of the Aubrey Project is not in its dependable yield, but instead in its potential contribution to "overdraft" operations, a value which can only be realized by cities like Dallas and Denton which have multiple-source water supplies.

Frisco charges that the Commission ignored nearly all of the recommendations of its technical and legal staff suggesting limitations on the permits granted to Dallas. Frisco claims that because the Commission did not heed the advice of its own experts, the Commission's order should not be entitled to the weight normally accorded determinations of technical questions within an agency's expertise.

■ Power of decision resides in the agency and not in the staff. An agency staff only serves the agency. Staff recommendations may be accepted in whole or in part by the agency, or such recommendations may be rejected outright. It is the order of the agency that is reviewed by the courts, not the recommendation of the staff. Nevertheless, the court, in discharging its task of reviewing the record as a whole to determine whether the agency order is supported by substantial evidence, may take into account contrary staff recommendations or reports, as it would any other evidence. II Davis, *Administrative Law Treatise* § 10.04 (1958).

■ Frisco also quotes statements of individual commissioners made during the course of the hearing thought to be supportive of its position. It is immaterial what a commissioner may have said or thought in the process of arriving at his decision. *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1940). The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence.

■ Without the water supply from Lake Aubrey, Dallas, with its entourage of customer cities, has enough water from existing sources to meet the combined need until only about the year 2000. Whether or not Dallas will continue to serve its client cities is not known. That fact could not be ascertained by the Commission. We know of no requirement that the Commission impose any conditions on any appropriation permits that it issues. Because the Commission was not required by statute or rule to condition its permit upon continued service to the customer cities, the Commission's failure to condition does not render the order arbitrary or capricious.

■ The Commission's order granting Dallas seventy-four percent of the water of Lake Aubrey is supported by substantial evidence. Dallas (and Denton) possess the means and the resources for the full and successful development of the project. Moreover, substantial savings to the public will be realized by the planned "overdrafting" of the waters of Lake Aubrey. The statutes that authorize the Commission to grant or deny applications for appropriative permits contemplate the exercise of broad administrative discretion by the Commission. *City of San Antonio v. Texas Water Commission, supra.* The grant of the permit to Dallas was an appropriate exercise of that discretion. Point of error one is overruled.

Frisco argues, finally, that the judgment is erroneous in that it affirms a Commission order that allows diversion of water outside the Elm Fork watershed. Frisco states that although the Trinity River Basin is primarily composed of four streams (West Fork, Clear Fork, Elm Fork, and East Fork), the Aubrey Project is located exclusively within the drainage area comprising the Elm Fork watershed. Although all of the water from the Aubrey Project will be used within the Trinity River Basin, Frisco's evidence was, and the Commission found, that much of the water allocated to Dallas will be used outside the Elm Fork watershed.[2]

Frisco claims that the diversion allowed by the Commission is prohibited by Tex. Water Code § 11.085(a) (Supp.1978) which forbids the taking or diverting of water from ". . . any stream, watercourse, or watershed in this state into any other natural stream, watercourse, or watershed to the *prejudice* of any person or property situated within the watershed from which the water is proposed to be taken or diverted." (Emphasis added)

Frisco insists that § 11.085(a) refers to inter*watershed* transfers, not to inter*basin* transfers. According to Frisco's view, § 11.085(a) prohibits transfer of water from the Elm Fork watershed even though the destination of the water is still within the Trinity River Basin.

---

**2.** It is of some interest that Frisco's engineer testified that twenty-four square miles of Fris-

co's eighty-eight square mile territory is also outside the Elm Fork watershed.

It is not necessary for this Court, in this instance, to tread the miry bog between "watershed" and "basin." See Johnson and Knippa, *Transbasin Diversion of Water,* 43 Texas L.Rev. 1035, 1048 (1965). Assuming arguendo that § 11.085(a) prohibits the transfer of water to Dallas, Frisco, as discussed previously, was unable to demonstrate its need for water from the Aubrey Project. Accordingly, Frisco has not shown that either it or others were *prejudiced* under the statute, if it were applicable, by transfer of water from the Aubrey Project to Dallas. Moreover, the Supreme Court has held that by § 11.085(a) (then art. 7589) the legislature ". . . intended to prohibit diversion out of the basin of origin *only* to the extent such diversion would impair water rights in existence at the time of the proposed diversion." *City of San Antonio v. Texas Water Commission, supra,* at 759. Frisco had no rights in existence in the Elm Fork watershed at the time the diversion was proposed.

All of Frisco's contentions have been considered, all are without merit, and all are overruled.

The judgment is affirmed.

Affirmed.