ACCEPTED
15-25-00018-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/25/2025 3:02 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00018-CV

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/25/2025 3:02:07 PM
CHRISTOPHER A. PRINE
Clerk

**PUBLIC UTILITY COMMISSION OF TEXAS,**

*Appellant / Cross-Appellee,*

v.

**CITY OF DENTON, OPERATING AS
DENTON MUNICIPAL ELECTRIC,**

*Appellee / Cross-Appellant.*

On Appeal from the 459th Judicial Court,
Travis County, Texas
Cause No. D-1-GN-23-008974

## REPLY BRIEF FOR CROSS-APPELLANT CITY OF DENTON

Jose E. de la Fuente
State Bar No. 00793605
Gabrielle C. Smith
State Bar No. 24093172
Jamie L. Mauldin
State Bar No. 24065694
Roslyn M. Warner
State Bar No. 24117520
**LLOYD GOSSELINK
ROCHELLE &TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800
(512) 472-0532 (Fax)

**ATTORNEYS FOR CROSS-APPELLANT
ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................2

INDEX OF AUTHORITIES .........................................................................4

GLOSSARY OF TERMS ..............................................................................5

SUMMARY OF REPLY ARGUMENTS.......................................................6

ARGUMENT AND AUTHORITIES ...........................................................10

    A.    The Commission relied on an arbitrary ad hoc standard to disallow recovery of DME's 6% ROI GFT component. ...................................................................10

        1.    The Commission used a baseless standard to justify the exclusion of DME's 6% ROI GFT component. ................................................................11

        2.    The Commission's decision interferes with a clear and established statutory right. .........................16

        3.    The Commission contravened Texas precedent. ........................................................................18

    B.    The ROI GFT component is an unavoidable expense DME is required to pay to the City.........................21

    C.    The Commission disregarded the range of reasonableness for the ROI GFT component supported in the record. ......................................................24

        1.    The record supported a minimum ROI GFT component of 3.5%.....................................................25

        2.    The Commission's restriction is inconsistent with the fees other utilities pay to the City. ...............27

    D.    DME's appeal of the Commission's order of an interim rate proceeding is appropriate because the capable-of-repetition-yet-evading-review exception to mootness applies.............................................29

CONCLUSION AND PRAYER.................................................................31

CERTIFICATE OF COMPLIANCE........................................................34

INDEX OF APPENDICES ..................................................................35

# INDEX OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Blum v. Lanier,*
   997 S.W.2d 259 (Tex. 1999) ................................................................... 30

*Catholic Leadership Coal. of Tex. v. Reisman,*
   764 F.3d 409 (5th Cir. 2014) ................................................................. 30

*City of Frisco v. Tex. Water Rights Comm'n),*
   579 S.W.2d 66 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ................. 13

*Heckman v. Williamson County,*
   369 S.W.3d 163 (Tex. 2012) ................................................................. 30

*San Antonio Indep. Sch. Dist. v. City of San Antonio,*
   550 S.W.2d 262 (Tex. 1977) ........................................... 17, 18, 19, 20

*Tex. State Bd. of Pharm. v. Witcher,*
   447 S.W.3d 520 (Tex. App.—Austin 2014, pet. denied.) .................... 14

**Statutes**

Tex. Gov't Code § 1502.057 ................................................................... 22

Tex. Gov't Code § 1502.059 ........................................................... 16, 17

**Regulations**

16 Tex. Admin. Code § 25.192 ................................................................ 23

# GLOSSARY OF TERMS

| | |
|---|---|
| Amended Application | Amended Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, December 1, 2022 |
| Application | Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, November 1, 2021 |
| AR | Administrative Record |
| City | City of Denton |
| Commission or PUC | Public Utility Commission of Texas |
| DME | Denton Municipal Electric |
| Final Order | Order in PUC Docket No. 52715, October 12, 2023 |
| GFT | General Fund Transfer |
| MOU | Municipally Owned Utility |
| ROI | Return on Investment |
| TCOS | Transmission Cost of Service |

## SUMMARY OF REPLY ARGUMENTS

No rule, law, or Public Utility Commission of Texas precedent authorizes the Commission to limit the inclusion of a reasonable General Fund Transfer in Transmission Cost of Service rates. (RR at Ex. 1, AR 118 at 18:17–19.) The Commission's only basis for prohibiting recovery of the full amount of Denton Municipal Electric's GFT is a novel, made-up standard by which the Commission would unilaterally grant itself the power to dictate the purpose of a City-mandated payment. But DME's full GFT is a required and unavoidable obligation, like any other routine expense a utility recovers in rates. While the Commission may have the discretion to evaluate whether expense *amounts* are appropriate, the Commission cannot interfere with the City's statutory right to require a transfer for any purpose.

Consistent with the City's designated purpose for the 6% Return on Investment component of DME's GFT, Texas law recognizes a city's right to earn a profit from its ownership and operation of a utility. Upholding the Commission's novel, arbitrary, and indeed nowhere-to-be-found standard of requiring that each GFT component be tied to specific and actual transmission costs would vitiate this standard and result in an

unrealistic and unjust result—i.e., unlike all other utilities, municipally-owned utilities cannot recover a statutorily-required expense and thus, must operate at a loss. The Commission's decision conflicts with unrebutted record evidence proving that any other utility operating within the City would pay (and recover in rates, of course) a greater fee to the City than the 5% franchise fee DME is limited to including in its TCOS. Limiting DME's ROI GFT component to 0% (that is, excluding *any* GFT component above the 5% franchise fee component) is similarly misaligned with the range substantiated in the record, which supports a minimum ROI GFT component of 3.5%, an amount the Commission approved in DME's previous TCOS rate.

The Commission has a long history of properly deferring to a City's reasonable GFT amount as an expense within TCOS rates. The Commission's application of its own rules and in light of the statutory grant of power to cities to set a GFT for any purpose has always been to allow inclusion of a GFT within the "other associated taxes" category under the applicable TCOS provision. The Commission has taken this approach to approve inclusion in transmission rates of a total GFT as high as 14%. Never before has the Commission subjected any other

7

MOU's request for GFT recovery to the standard it claims to have relied on in this case. There is a reason it hasn't done so: the Commission can trace this unprecedented "standard" only to the comments of a single commissioner in an open meeting discussion that occurred after DME had already filed its Application and Amended Application. The "standard" discussed then, and upon which the Commission now relies, has never been applied in any Commission decision and is not law.

The Commission's made-up standard is a post-hoc pretext to try to conceal the impermissible criteria actually underlying the decision—the Commission wanted to penalize DME for alleged "overearning." The Commission on the one hand defends its consideration of this arbitrary extra-legal factor by claiming it was only the "origin" of the proceeding and not the basis for any of the ultimate conclusions, yet on the other hand, in its briefing *in this very appeal*, repeatedly references that contention and purpose to support its ultimate decision. The Commission not only makes no secret of the fact that making up for purported past "overearning" was a factor in multiple elements of its rate-setting, it states so boldly. Many of the rules of this proceeding have continually (and arbitrarily) changed, but one thing has remained constant—the

8

Commission's insistence and pride in basing its decision on the legally unrecognized and false premise of "making up for past overearning," even though DME has only ever charged Commission-approved TCOS rates.[1] Once ingested, such legally impermissible poison has no antidote but reversal of the Final Order into which it was introduced.

---

[1] The Commission's reliance on inappropriate factors is further demonstrated by its continued emphasis on DME's "failure" to provide a depreciation study (Cross-Appellee's Br. at 9.) The Commission mischaracterizes this dispute as a requirement DME chose not to meet when it was an interpretive dispute in which an Administrative Law Judge agreed with DME's interpretation of the requirement. (RR at Ex. 1, AR 29 at 3.). This is another example of the irrelevant factors and the overarching and extra-legal motivation to punish DME as some sort of "bad actor" that the Commission would have the Court rely on in evaluating the Final Order.

## ARGUMENT AND AUTHORITIES

A.  **The Commission relied on an arbitrary ad hoc standard to disallow recovery of DME's 6% ROI GFT component.**

In search of a rationale to justify imposing an artificially low TCOS rate on DME by slashing its GFT recovery, the Commission looked not to any actual rule or established law, but rather to the remarks of one commissioner during an open meeting. Commission Staff then converted those offhand remarks into a Commission-wide "standard" and crafted a narrative that the Commission established that standard on that day. But the "standard" can be found in only one place: this case. The Commission only ever applied the "standard" to DME, even though no such standard had even been introduced, much less adopted as a rule, at the time DME filed the Application or the Amended Application.

The standard the Commission argues should apply is not only an ad hoc creation but is also grounded in a misunderstanding of the statute governing transmission rates and a reversal of the Commission's longstanding treatment of GFTs in TCOS rates. Moreover, the standard contradicts the statutory powers of municipalities and established precedent allowing cities to see a benefit from utility ownership. The very fact that the Commission had to justify its decision by conjuring up

10

a new standard illustrates that the true justification was the improper one the Commission has trumpeted through the entire case, including in this appeal—the Commission wanted to punish DME for alleged "overearning." At the very least, if this Court finds the new "standard" the Commission has imposed on DME to be valid and have the force of a rule, the only appropriate course of action is to remand to provide DME the opportunity to present evidence responsive to the standard, as the "rule" was adopted after the case was well underway.

### 1. The Commission used a baseless standard to justify the exclusion of DME's 6% ROI GFT component.

From the inception of this case, the legal principles with which the Commission has expected DME to comply have been a moving target. The rationale behind the Commission's complete disallowance of *any* GFT beyond DME's franchise fee component is no exception. The Commission rejected recovery of DME's 6% ROI GFT component in its entirety using a "standard" never applied, or even mentioned, in its rules or any TCOS precedent: the *purpose* of any requested transfer beyond a franchise fee now must be directly related to the provision of transmission service. The Commission latched on to this unfounded standard after Commission Staff incorrectly treated it as an established

legal authority in testimony. However, this standard is not codified in any rule or law governing recovery of GFT in rates and springs solely from a single commissioner musing on the issues presented in a separate case during the pendency of DME's case.

In January 2023, after DME had filed both its Application and its Amended Application, the Commission considered a proposed settlement in another MOU's TCOS application. *See* PUC Docket No. 52728, *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, (final order) (Jul. 11, 2024). During consideration of that settlement, one commissioner suggested an unprecedented interpretation of how GFTs should be evaluated in TCOS proceedings by stating that the MOU should only be allowed to recover GFT costs "justified by a specific rationale" related to the "actual cost" of transmission service. (RR at Ex. 1, AR 113 at 43:5–17.) While other commissioners weighed in on a separate issue, no other commissioner agreed with or commented on this interpretation, and no vote was held to adopt any such standard or rule. After the discussion, the Commission issued a remand order in that case, which addressed a different GFT issue and did not in any way memorialize the "standard" invented by the

12

single commissioner. The standard was similarly absent from the final order ultimately issued in that proceeding. In fact, without any imposition or mention of the purported standard discussed, the Commission approved a settlement allowing *that* MOU to begin recovering a 9% GFT in its transmission rates.[2]

The commentary of a single commissioner on the dais of course is not binding precedent. "The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained…" *City of Frisco v. Tex. Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. App.—Austin 1979, writ ref'd n.r.e.). Despite that long-established principle, the Commission Staff witness evaluating DME's GFT inclusion filed testimony relying on the commissioner's statement as if it created binding law. (*See* RR at Ex. 1, AR 113 at 14:13–15:16.) The comments made did not even occur in DME's case but, somehow, it was the basis Commission Staff provided for recommending complete disallowance of any GFT beyond the 5%

---

[2] *See* PUC Docket No. 52728, *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, (Application at 44:10–17) (Nov. 3, 2021) (explaining the requested 9% GFT); Uncontested Stipulation and Settlement Agreement (Aug. 16, 2022); SOAH Proposal for Decision with Memorandum at 2 (Dec. 21, 2023) (explaining sole contested issue was a different GFT question; the 9% was uncontested in the approved settlement).

franchise fee component. Using the oral statements of a single commissioner in a separate case as binding law to bar *all recovery* of DME's ROI GFT component is extra-legal both because it relies on a "standard" that is not a rule or precedent and because it actually serves the Commission's genuine (and extra-legal) basis for its decision—to penalize DME for violating an artificial definition of overearning in the past.

When DME filed the Application, it presented evidence related to its GFT obligation without any notice or knowledge of the unprecedented (and not-yet "established") standard the Commission would employ to evaluate that evidence. DME had no opportunity to include evidence in its Application or Amended Application addressing this standard— because the standard did not exist (of course, it still doesn't). As a result, the Commission unlawfully deprived DME from recovering a crucial component of its GFT by creating and retroactively applying a new burden of proof. Moreover, the "standard" the Commission relies on for invalidating DME's 6% ROI was never promulgated as a formal rule and is therefore invalid. *Tex. State Bd. of Pharm. v. Witcher*, 447 S.W.3d 520, 527 (Tex. App.—Austin 2014, pet. denied.). Neither DME nor any other

impacted entity had notice that a single commissioners' thoughts voiced from the dais in another case would somehow become the "rule" to be adopted and applied to MOU requests for inclusion of GFTs in all TCOS proceedings moving forward.

Furthermore, the Commission's rationale to impose its standard is plagued by contradiction. The Commission first acknowledges that all transfers are unique and should be evaluated on their own merit for reasonableness but then imposes and defends a cut-and-dry standard: if the transfer cannot be directly traced to transmission costs, it is disallowed. What possible certainty can an MOU have in requesting recovery of a GFT if the Commission is simultaneously promoting a strict, unprecedented standard *and* asserting that transfers are permitted under "some circumstances?" (Cross-Appellee's Br. at 7.) Never mind that the Commission does not and cannot explain or provide the legal authority for what those circumstances may be. The Commission's baseless standard additionally sends the message that cities are expected to own and operate utilities at cost, or less than cost, even if those cities are contributing infrastructure to electricity users throughout the state

15

and assuming the associated risks of that contribution.  This is a plain disincentive for MOUs to serve as transmission providers.

### 2. *The Commission's decision interferes with a clear and established statutory right.*

The Commission's new standard hinges on the concept that the *Commission* has the authority to evaluate the stated *purpose* of a GFT and deny inclusion in rates if the purpose is not tied to the exact costs of providing transmission service.  But it cannot be possible for this authority—determination of and veto power over a GFT purpose—to rest with the Commission because it would nullify municipalities' existing statutory rights.  Cities, not the Commission, are statutorily vested with the authority to make a transfer from an MOU to their general revenue fund and to determine and declare the purpose(s) of the transfer.  Tex. Gov't Code § 1502.059.  The idea that the Commission has authority to scrutinize the *purpose* of a reasonable GFT amount before allowing it to be recovered in rates makes the Commission the maker of municipal policy, effectively voiding this longstanding municipal power specifically conferred on cities alone by the Legislature.  DME's GFT was properly authorized by the City based on the City's exclusive statutory authority.

Like any other expense included in rates under its jurisdiction, the Commission has the authority to evaluate the reasonableness of the *amount* of a GFT, but municipalities are explicitly and exclusively empowered to determine the *purpose* of the transfer. And a city's statutory authority to do so is broad: by law, a GFT may be for any "general or special" purpose. Tex. Gov't Code § 1502.059. The law likewise does not require that a GFT must be broken out into specific line-items or tied to each specific service a city-owned utility is providing. Such limitations would inhibit the rationale behind this statutory right of cities: cities own utilities in a proprietary capacity. *San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 264 (Tex. 1977). A city that owns a utility has a right to receive a reasonable portion of that utility's revenue, regardless of whether each source of revenue is distinctly identified. Further, a utility's revenue is inherently generated from the rates it charges for the services it provides. If the 6% of revenues DME is required to pay to the City cannot come from rate revenue, then the utility can never meet its obligation to the City, as DME does not receive revenue from other sources. Either the City has the statutory right to require a transfer for general or special purposes or the transfer

17

must be tied to the actual cost of providing transmission service (or any other purpose-based requirement that the Commission conjures up on the fly). Both cannot be true. And only one exists under the law as set by the Legislature.

### 3. *The Commission contravened Texas precedent.*

The Commission's attack on DME's ROI GFT component as "additional compensation" contradicts Texas precedent affirming a municipality's right to benefit from a reasonable amount of excess revenues as compensation for utility ownership. *San Antonio,* 550 S.W.2d at 264. In the *San Antonio* case, the Court recognized that the original version of the Texas Government Code provision giving cities the authority to require transfers from utility revenues was written to account only for service costs and payments consistent with taxes. *Id.* The court then observed that the law was subsequently modified to allow for more than only cost recovery to intentionally recognize a city's right to receive value from its utility ownership as well. *Id.* That is, the very purpose-based restriction on GFTs that the Commission would impose here was already stricken by the Legislature.

18

As the Commission stated in its brief, the only issue in the *San Antonio* case was whether an MOU can recover a GFT in rates. (Cross-Appellee's Br. at 20.) The Commission misses the mark, however, because the Court's ruling was that MOUs *can* recover a GFT in rates. Like DME's ROI component, the City of San Antonio required a 14% GFT that was transferred only after other specific categories were funded. *Id.* at 263. The Court further acknowledged that part of the transfer reimbursed the City in lieu of ad valorem taxes that otherwise would be received if the systems were not municipally owned. *Id.* at 263–64. The Court specifically noted that anything left was "all gain" to the City. *Id.* at 264. The Court upheld these findings without scrutinizing whether each part of the transfer was tied to specific utility services or whether every penny could be traced to the same taxes or fees paid by all other utilities, almost certainly because there was no need or legal basis for it to do so.

The Commission misconstrues the application of the *San Antonio* decision to DME's case. The Court stated that "if the City's return were *proved* to be excessive or unreasonable, the courts could grant relief" as to allegations of unreasonableness. *Id.* at 265 (emphasis added). Here,

the Commission used a made-up standard to support the "unreasonableness" of DME's ROI GFT component based entirely on its purpose and then not only categorically disallowed any GFT above franchise fee cost recovery but *also* unlawfully slashed DME's return calculation by imposing an incorrect Debt Service Coverage Ratio (again, *all* of which was in service of the Commission's stated, extra-legal goal of making up for DME's past "overearning"). The District Court recognized the Commission's unlawful action. Accordingly, DME's return has not been shown to be excessive or unreasonable. Additionally, the Commission argues that since the *San Antonio* decision is: (1) old; and (2) applies only to retail rates, it should not apply here. (Cross-Appellee's Br. at 20.) While those things may be true, the holding still applies—an MOU is allowed a GFT in rates, for any general or special purpose, and a city has the right to make a reasonable profit from its municipally-owned utilities. The Commission stripped both DME and the City of the right to make a reasonable profit by inappropriately limiting the Debt Service Coverage Ratio and by creating and imposing another arbitrary and impermissible standard related to GFT.

**B.** **The ROI GFT component is an unavoidable expense DME is required to pay to the City.**

The Commission inaccurately characterizes the ROI component of DME's GFT as a discretionary payment when in fact it is a mandatory financial obligation the utility must pay. Based on its statutory right to do so, the City designated the purpose of the ROI component as a benefit to the City and its citizens for utility ownership. (RR at Ex. 1, AR 176 at 56:3–11.) Under Texas law, designating this purpose is solely within the City's discretion. Transferring a reasonable portion of utility revenues to the City's general fund accomplishes this purpose by adding to the funds available for important city services or projects. The existence of this purpose does not interfere with or stack on top of the rate of return *DME* receives on its utility infrastructure. Nor does this purpose detract from the fact that the transfer is akin to any other expense DME is required to pay. The Commission's position mistakenly assumes that it has the power to declare this municipally determined purpose inappropriate or otherwise dictate what a *correct* purpose for a GFT would be.

In defending its prohibition of DME's GFT as an expense, the Commission relies on a statutory list of MOU expenses as if it were an exclusive list when the plain language of that list itself is *not* exclusive.

Specifically, the Commission asserts that if general fund transfers were recoverable, they would be included in the list of expenses found under Tex. Gov't Code § 1502.057. (Cross-Appellee's Br. at 25.) Here again, the Commission is inconsistent in its treatment of GFT. If this rationale were accurate, then franchise fees (as just one example of an expense that is not listed in the statute) would *have to be* disallowed in a GFT since they are not specifically included in the list of expenses provided in Tex. Gov't Code § 1502.057. The Commission's error in this argument is demonstrated by the inconsistency of the Commission customarily approving a portion of the GFT (franchise fee component) that is not specifically listed in the statute. Additionally, the Commission's argument is contrary to the plain language of the statute. The section does not create an exclusive list of recoverable expenses and only those expenses; rather, it simply lists *minimum* expenses a city-owned utility should be able to cover. The statute establishes that "[a] municipality shall impose and collect charges for services provided by a utility system in amounts *at least sufficient to pay*" the enumerated expenses. Tex. Gov't Code § 1502.057 (emphasis added). The term "at least" has a clear meaning. If the list of permissible charges was intended to be exclusive

22

and exhaustive, the language would have stated so. Instead, it stated the opposite. By using the phrase "at least sufficient to pay," this list of expenses was specifically intended to set the floor for what an MOU should be able to fund through the rates it charges.

The Commission's treatment of the ROI GFT component as an unallowable expense is further shown to be improper by its own practice and precedent of routinely approving GFTs in TCOS rates within an established expense category. The Commission argues that the absence of GFT references in the laws governing transmission rates effectively means the Commission can prohibit recovery of GFTs in their entirety. (Cross-Appellee's Br. at 25.) However, the Commission's longstanding application of 16 Tex. Admin. Code § 25.192 is to approve inclusion of a GFT within the explicitly stated category of "other associated taxes." *See, e.g.,* PUC Docket No. 52728, *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, (Order on Rehearing at Finding of Fact No. 47) (Jul. 11, 2024) (providing that GFTs are typically included in the revenue requirement as a separate expense item, most often appearing in the "other taxes" line item). There is also record evidence in this case that credit rating agencies consider GFTs as

operating expenses when setting or reviewing credit ratings. (RR at Ex. 1, AR 2 at 176:19–177:15.) The Commission has always approved inclusion of a GFT within the "other associated taxes" category, regardless of the City-designated purpose of the transfer. No MOU has ever before been required to tie each aspect of its GFT to specific transmission costs. Indeed, there has never been a "standard" that requires it, nor is there a standard now that requires it. GFT is a required utility expense, full stop.

## C. The Commission disregarded the range of reasonableness for the ROI GFT component supported in the record.

Perhaps the Commission could have crafted some evidentiary justification for a ROI GFT component less than the 6% required by the City. But the Commission's decision to preclude ROI recovery altogether and effectively allow DME 0% recovery lacks sufficient (or any) basis in the record. The Commission provided no explanation for ignoring the 3.5–6% range for that component discussed in the evidence, and the outright disallowance is at odds with the Commission's own prior ruling allowing DME's ROI GFT component recovery in DME's last full TCOS rate case. The Commission additionally failed to address the undisputed

fact that any other utility operating in the City would make payments to the City in an amount greater than just a 5% franchise fee.

### 1. *The record supported a minimum ROI GFT component of 3.5%.*

The path the Commission took to impose its limitation on DME's GFT recovery was an improper one; to arrive at its conclusion, the Commission not only had to ignore the evidence but actually had to act in derogation of the evidence. In 2022, the City passed an ordinance formally approving an ROI GFT component of 6% of gross revenues. (RR at Ex. 1, AR 182.a at 198–99.) DME additionally provided evidence of the City Charter, which requires a return on the net investment of the utility system after other expenses have been paid. (RR at Ex. 1, AR 176 at 56:1–11.) The record showed that 3.5% is the ROI GFT component the City requires of its water and wastewater utilities, and that percentage was also the previous ROI GFT component required of DME (which was allowed, with full disclosure of its purpose, in DME's prior TCOS rate). (RR at Ex. 1, AR 90 at 192; AR 176 at 371.) The only rationale for ordering a 0% ROI GFT component requires disregarding all record evidence, instead relying on the one-off commissioner statements and applying a standard for evidentiary support that does not exist.

25

Accordingly, the Commission's permissible, evidence-based universe for evaluating inclusion of an ROI GFT component was a range between 3.5% and 6%.

Out of thin air and with no grounding in the record beyond the artificial standard discussed above, the Commission arbitrarily selected a 0% ROI GFT component. In contrast, what the Commission has done before, under the same law, as to the same party, and as to the same type of GFT component, shows the Commission's error here. Not only was there no reasonable support in the record in this case for a 0% ROI GFT component, the Commission itself previously approved recovery of a 3.5% ROI GFT component in DME's transmission costs, applying a statutory and rule-based standard *that has not changed since then. See* PUC Docket No. 30358, *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, (final order) (Jun. 16, 2005). When the Commission approved inclusion of the 3.5% ROI component in DME's previous application, it did not impose any requirement and conducted no analysis as to whether that percentage was specifically tied to transmission costs. The Commission did not examine each element of DME's GFT or override the purpose of the transfer as set by the City.

That is because, of course, there was no basis in any statute or rule to do so. Instead, the Commission evaluated the evidence and found a 3.5% ROI to be reasonable. Without any attempt to conceal its real motive of penalizing DME for alleged overearning, the Commission ignored the 3.5% floor supported by the evidence, arbitrarily and punitively set DME's ROI GFT component recovery at 0%, providing no explanation at the time for doing so other than its brand-new purpose-based standard.

2.    *The Commission's restriction is inconsistent with the fees other utilities pay to the City.*

If DME were not a city-owned utility, it would pay more than a mere franchise fee to the City. This was proven in the record without dispute or rebuttal. And yet, the Commission inexplicably gave this unrebutted evidence no weight before rejecting DME's 6% ROI GFT component.

DME's evidence explained that the 6% ROI component provides cost recovery to the City of revenue streams DME would otherwise have to pay to the City as a stand-alone utility if not for the fact that it is a business unit of the City. (RR at Ex. 1, AR 176 at 55:14–17.) Witnesses for DME, Commission Staff, and the Office of Public Utility Counsel *all agreed* that other electric utilities operating in the City would pay taxes or additional fees beyond only a franchise fee. (AR 118 at 18:22–19:2; 168

27

at 70:7–23, 82:12–83:6.)  At a *minimum*, other utilities would pay a franchise fee and ad valorem taxes on property they own within the City. If DME is limited to only the 5% franchise fee, it is indisputably at a disadvantage compared to all other utilities operating in the City.  The Commission's decision effectively forces the City to lose money by owning its own utility.

The Commission argues (again, after-the-fact and outside of any record evidence) that DME should have provided specific dollar amounts for the ad valorem amounts other utilities pay to the City and that, by titling the transfer "Return on Investment," there is no possible way the transfer can be commensurate with ad valorem taxes or other fees the City charges to utilities.  (Cross-Appellee's Br. at 19.)  However, it is firmly established that MOUs may refer to a GFT using a wide array of terms.  (RR at Ex. 1, AR 113 at 10:23–11:4.) And of course, municipalities have the authority to name the transfer that they require.  It is undisputed that if DME were not owned by the City, it would pay the City additional fees for its operations beyond a franchise fee. To limit the percentage of revenues DME transfers to the City to a value known to be lower than any other utility operating in the City is facially

28

discriminatory. Regardless of the nomenclature of the transfer, the City has an established statutory right to require a reasonable sum of revenues from DME for any purpose. The Commission cannot abrogate this right by creating new evidentiary standards for MOUs to have the revenues necessary to fund a reasonable GFT, and likewise cannot disregard the only, unrebutted evidence on the point establishing that any other utility operating in the City would pay to the City an amount greater than just the 5% franchise fee GFT component.

**D. DME's appeal of the Commission's order of an interim rate proceeding is appropriate because the capable-of-repetition-yet-evading-review exception to mootness applies.**

DME's initial Appellant's brief explained why the Commission's order of an interim rate proceeding was beyond the Commission's authority. The Commission's primary response (asserted for the first time in its Response brief in this appeal) seems to be that, as that interim rate proceeding ordered by the Commission's Final Order went forward and is now concluded, the question is moot. However, because the Commission maintains that it has the right to continue to order such proceedings in the future, including as to DME, the capable-of-repetition-yet-evading-review exception to mootness applies.

29

This exception applies where a party shows that (1) "the challenged act is of such short duration that the appellant cannot obtain review before the issue becomes moot," and (2) "a reasonable expectation [exists that] the same action will occur again if the issue is not considered." *Blum v. Lanier*, 997 S.W.2d 259, 264 (Tex. 1999) (cleaned up). Regarding the second factor, the issue is "whether the controversy [is] *capable* of repetition," so a complaining party need not show the illegality will reoccur with "mathematical precision," but simply "'a reasonable expectation' that the challenged illegality will reoccur." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014) (emphasis added) (cleaned up). The exception "generally applies only if the plaintiff can show that the claim is available as to him." *Heckman v. Williamson County*, 369 S.W.3d 163, 164 (Tex. 2012).

There is no question that the interim rate proceeding was of short duration; from start to finish took a mere 54 days. *See* PUC Docket No. 56102, *Application of Denton Municipal Electric for Interim Update of Wholesale Transmission Rates* (Mar. 4, 2024) (the application was filed on January 10, 2024, and the Notice of Approval was issued on March 4, 2024). Second, it is reasonable to expect that DME in particular (along

with all other MOUs with transmission systems, for that matter) will experience the same wrongful conduct by the Commission. DME will continue to file TCOS rate cases when it deems them to be necessary and appropriate, and if those proceedings take any material length of time, the Commission is likely to repeat its pattern of ordering an immediate interim rate filing (as it has boldly claimed it has every right to do). Therefore, this question is not moot and, for the reasons stated in DME's initial Appellant's brief, the Court should reverse the Commission's Final Order provision ordering that DME file an interim rate proceeding within 90 days.

## CONCLUSION AND PRAYER

The Commission's categorical denial of DME's 6% ROI GFT component—resulting in an allowance of *zero* GFT recovery above the 5% franchise fee component—is based on both an unlawful ad hoc standard and conscious disregard for the evidentiary record, all of which is more egregious and extra-legal in light of the Commission's consistent admitted inappropriate goal of setting an artificially low TCOS rate to make up for past "overearning." This Court should reverse the Final Order as to the complete disallowance of DME's 6% ROI GFT component

and as to its requirement of an immediate interim rate proceeding and remand the case to the Commission for further proceedings consistent with its ruling.

Respectfully submitted,

**LLOYD GOSSELINK ROCHELLE
  & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By:  */s/   Jose E. de la Fuente*
        JOSE E. de la FUENTE
        State Bar No. 00793605
        jdelafuente@lglawfirm.com
        GABRIELLE C. SMITH
        State Bar No. 24093172
        gsmith@lglawfirm.com
        JAMIE L. MAULDIN
        State Bar No. 24065694
        jmauldin@lglawfirm.com
        ROSLYN M. WARNER
        State Bar No. 24117520
        rwarner@lglawfirm.com

**ATTORNEYS FOR APPELLEE/
CROSS-APPELLANT**

# CERTIFICATE OF COMPLIANCE

I, Jose E. de la Fuente, attorney for Appellee/Cross-Appellant the City of Denton, operating as Denton Municipal Electric, certify that this document was generated by a computer using Microsoft Word 365, which indicates that the word count of this document is 5,520 per Tex. R. App. P. 9.4(i).

*/s/ Jose E. de la Fuente*
Jose E. de la Fuente

# INDEX OF APPENDICES

**App. A**    Tex. Gov't Code § 1502.057

# APPENDIX A

## Sec. 1502.057. Charges for Services.

**(a)** A municipality shall impose and collect charges for services provided by a utility system in amounts at least sufficient to pay:

**(1)** all operating, maintenance, depreciation, replacement, improvement, and interest charges in connection with the utility system;

**(2)** for an interest and sinking fund sufficient to pay any public securities issued or obligations incurred for any purpose described by Section 1502.002 relating to the utility system; and

**(3)** any outstanding debt against the system.

**(b)** The rates charged for services provided by a utility system must be equal and uniform. A municipality may not allow any free service except for:

**(1)** municipal public schools; or

**(2)** buildings and institutions operated by the municipality.

**(c)** The board of trustees having management and control of a utility system located in a county contiguous to the Gulf of Mexico and bordering the United Mexican States may impose and collect the charges authorized under this section for services provided by the utility system.

## History

Enacted by Acts 1999, 76th Leg., ch. 227 (H.B. 3157), § 1, effective September 1, 1999; am. Acts 1999, 76th Leg., ch. 1064 (H.B. 3224), § 22, effective September 1, 1999 (renumbered from Sec. 1502.059); am. Acts 2013, 83rd Leg., ch. 341 (H.B. 2105), § 2, effective June 14, 2013.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Melissa Ethridge on behalf of Jose de la Fuente
Bar No. 00793605
methridge@lglawfirm.com
Envelope ID: 104810147
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Reply Brief for Cross-Appellant City of Denton
Status as of 8/25/2025 3:10 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Katherine Coleman | 24059596 | kcoleman@omm.com | 8/25/2025 3:02:07 PM | SENT |
| Jamie Mauldin | 24065694 | jmauldin@lglawfirm.com | 8/25/2025 3:02:07 PM | SENT |
| Gabrielle Smith | 24093172 | gsmith@lglawfirm.com | 8/25/2025 3:02:07 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Jose E.de la Fuente | | jdelafuente@lglawfirm.com | 8/25/2025 3:02:07 PM | SENT |
| Amy Hoffee | | amy.hoffee@cityofdenton.com | 8/25/2025 3:02:07 PM | SENT |
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| John Hubbard | | jhubbard@omm.com | 8/25/2025 3:02:07 PM | SENT |
| Christiana Segura | 24143396 | christiana.segura@opuc.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| James ScottMcCarley | | scott.mccarley@oag.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Devin Alexander | | devin.alexander@cityofdenton.com | 8/25/2025 3:02:07 PM | SENT |
| Roslyn Warner | | rwarner@lglawfirm.com | 8/25/2025 3:02:07 PM | SENT |
| Michael McMillin | | mmcmillin@omm.com | 8/25/2025 3:02:07 PM | SENT |
| Sharbel Sfeir | | sharbel.sfeir@opuc.texas.gov | 8/25/2025 3:02:07 PM | SENT |
| Marcella Lunn | | marcella.lunn@cityofdenton.com | 8/25/2025 3:02:07 PM | SENT |
| Michael Martinez | | michael.martinez@opuc.texas.gov | 8/25/2025 3:02:07 PM | SENT |